[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-16135

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 28, 2004
THOMAS  K. KAHN
CLERK

D. C. Docket No. 98-01938-CV-S-NE

SHERRI WILLIAMS,
B. J. BAILEY,

Plaintiffs-Appellees,

BETTY FAYE HAGGERMAKER, et al.,

Plaintiffs,

ALICE JEAN COPE,
JANE DOE,
DEBORAH L. COOPER,
BENNY COOPER,
DAN BAILEY,
JANE POE,
JANE ROE,

Plaintiffs-Appellees,

versus

ATTORNEY GENERAL OF ALABAMA,

Defendant-Appellant,

TIM MORGAN,
in his official capacity as the District
Attorney of the County of Madison, Alabama,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

**(July 28, 2004)**

Before BIRCH, BARKETT and HILL, Circuit Judges.

BIRCH, Circuit Judge:

In this case, the American Civil Liberties Union ("ACLU")[1] invites us to add a new right to the current catalogue of fundamental rights under the Constitution: a right to sexual privacy. It further asks us to declare Alabama's statute prohibiting the sale of "sex toys" to be an impermissible burden on this right. Alabama responds that the statute exercises a time-honored use of state police power—restricting the sale of sex. We are compelled to agree with Alabama and must decline the ACLU's invitation.

## I. BACKGROUND

---

[1] Because the various user appellees and vendor appellees are all represented by the ACLU, the driving force behind this litigation, "the ACLU" will be used to refer collectively to appellees.

Alabama's Anti-Obscenity Enforcement Act prohibits, among other things, the commercial distribution of "any device designed or marketed as useful primarily for the stimulation of human genital organs for any thing of pecuniary value." Ala. Code § 13A-12-200.2 (Supp. 2003).

The Alabama statute proscribes a relatively narrow bandwidth of activity. It prohibits only the sale—but not the use, possession, or gratuitous distribution—of sexual devices (in fact, the users involved in this litigation acknowledge that they already possess multiple sex toys). The law does not affect the distribution of a number of other sexual products such as ribbed condoms or virility drugs. Nor does it prohibit Alabama residents from purchasing sexual devices out of state and bringing them back into Alabama. Moreover, the statute permits the sale of ordinary vibrators and body massagers that, although useful as sexual aids, are not "designed or marketed . . . primarily" for that particular purpose. Id. Finally, the statute exempts sales of sexual devices "for a bona fide medical, scientific, educational, legislative, judicial, or law enforcement purpose." Id. § 13A-12-200.4.

This case, which is now before us on appeal for the second time, involves a challenge to the constitutionality of the Alabama statute. The ACLU, on behalf of various individual users and vendors of sexual devices, initially filed suit seeking

3

to enjoin the statute on 29 July 1998, a month after the statute took effect. The ACLU argued that the statute burdens and violates sexual-device users' right to privacy and personal autonomy under the Fourteenth Amendment to the United States Constitution.[2]

Following a bench trial, the district court concluded that there was no currently recognized fundamental right to use sexual devices and declined the ACLU's invitation to create such a right. Williams v. Pryor, 41 F. Supp. 2d. 1257, 1282-84 (N.D.Ala. 1999) (Williams I). The district court then proceeded to scrutinize the statute under rational basis review. Id. at 1284. Concluding that the statute lacked any rational basis, the district court permanently enjoined its enforcement. Id. at 1293.

On appeal, we reversed in part and affirmed in part. Williams v. Pryor, 240 F.3d 944 (11th Cir. 2001) (Williams II). We reversed the district court's conclusion that the statute lacked a rational basis and held that the promotion and preservation of public morality provided a rational basis. Id. at 952. However, we affirmed the district court's rejection of the ACLU's *facial* fundamental-rights challenge to the statute. Id. at 955. We then remanded the action to the district

---

[2] The ACLU also invokes the First, Fourth, Fifth, and Ninth Amendments.

4

court for further consideration of the *as-applied* fundamental-rights challenge. Id. at 955.

On remand, the district court again struck down the statute. Williams v. Pryor, 220 F. Supp. 2d 1257 (N.D. Ala. 2002) (Williams III). On cross motions for summary judgment, the district court held that the statute unconstitutionally burdened the right to use sexual devices within private adult, consensual sexual relationships. Id. After a lengthy discussion of the history of sex in America, the district court announced a fundamental right to "sexual privacy," which, although unrecognized under any existing Supreme Court precedent, the district court found to be deeply rooted in the history and traditions of our nation. Id. at 1296. The district court further found that this right "encompass[es] the right to use sexual devices like the vibrators, dildos, anal beads, and artificial vaginas" marketed by the vendors involved in this case. Id. The district court accordingly applied strict scrutiny to the statute. Id. Finding that the statute failed strict scrutiny, the district court granted summary judgment to the ACLU and once again enjoined the statute's enforcement. Id. at 1307.

Alabama now appeals that decision. The only question on this appeal is whether the statute, as applied to the involved users and vendors, violates any

fundamental right protected under the Constitution.[3]  The proper analysis for evaluating this question turns on whether the right asserted by the ACLU falls within the parameters of any presently recognized fundamental right or whether it instead requires us to recognize a hitherto unarticulated fundamental right.

## II.  DISCUSSION

We review a summary judgment decision de novo and apply the same legal standard used by the district court.  Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003).  Our de novo review begins with a discussion of the asserted right.  Here, we reaffirm our conclusion in Williams II, 240 F.3d at 954, that no Supreme Court precedents, including the recent decision in Lawrence v. Texas, ___ U.S. ___, 123 S. Ct. 2472 (2003), are decisive on the question of the existence of such a right.  Because the ACLU is asking us to recognize a new fundamental right, we then apply the analysis required by Washington v. Glucksberg, 521 U.S. 702, 117 S. Ct. 2258 (1997).  As we explain,  we conclude that the asserted right does not clear the Glucksberg bar.

---

[3]As a threshold matter, Alabama also argues that the district court lacked jurisdiction to hear the case because the vendors and users do not have standing to sue.  The district court properly concluded that vendors and users have shown a high probability of suffering a legally cognizable injury as result of the statute and thus have demonstrated standing, and we adopt its analysis in this regard.  Williams III, 220 F. Supp.2d at 1267-73.

## A. Asserted Right

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property without due process of law." The most familiar function of this Clause is to guarantee procedural fairness in the context of any deprivation of life, liberty, or property by the State. The users and vendors here do not claim to have been denied procedural due process. Instead, they rely on the Due Process Clause's *substantive* component, which courts have long recognized as providing "heightened protection against government interference with certain fundamental rights and liberty interests." Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000) (citation omitted).

> The ACLU argues that the use of sexual devices is among those activities that, although not enumerated in the Constitution, are protected under the concept of substantive due process. According to the ACLU, the State of Alabama, through its prohibition on the commercial distribution of sex toys qua sex toys, has intruded into the most intimate of places—the bedrooms of its citizens—and the lawful sexual conduct that occurs therein. While the statute's reach does not directly proscribe the sexual conduct in question, it places—without justification—a substantial and undue burden on the ability of the plaintiffs to obtain devices regulated by the statute. By restricting sales of these devices to plaintiffs, Alabama has acted in violation of the fundamental rights of privacy and personal autonomy that protect an individual's lawful sexual practices guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution.

<u>Williams III</u>, at 1261 (quoting the ACLU's amended complaint).

The ACLU invokes "privacy" and "personal autonomy" as if such phrases were constitutional talismans. In the abstract, however, there is no fundamental right to either. <u>See, e.g.</u>, <u>Glucksberg</u>, 521 U.S. at 725, 117 S. Ct. at 2270 (fundamental rights are "not simply deduced from abstract concepts of personal autonomy"). Undoubtedly, many fundamental rights currently recognized under Supreme Court precedent touch on matters of personal autonomy and privacy. However, "[t]hat many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected." <u>Id.</u> at 727, 117 S. Ct. at 2271. Such rights have been denominated "fundamental" not simply because they implicate deeply personal and private considerations, but because they have been identified as "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." <u>Id.</u> at 720-21, 117 S. Ct. at 2268 (internal citations and quotation marks omitted).

Nor, contrary to the ACLU's assertion, have the Supreme Court's substantive-due-process precedents recognized a free-standing "right to sexual privacy." The Court has been presented with repeated opportunities to identify a

8

fundamental right to sexual privacy—and has invariably declined.  See, e.g., Carey

v. Population Servs. Int'l, 431 U.S. 678, 688 n.5, 97 S. Ct. 2010, 2018 n.5 (1977)

(noting that the Court "has not definitively answered the difficult question whether

and to what extent the Constitution prohibits state statutes regulating private

consensual sexual behavior among adults, and we do not purport to answer that

question now") (internal citation and punctuation omitted).  Although many of the

Court's "privacy" decisions have implicated sexual matters, see, e.g., Planned

Parenthood v. Casey, 505 U.S. 833, 112 S. Ct. 2791 (1992) (abortion); Carey, 431

U.S. at 678, 97 S. Ct. at 2010 (contraceptives), the Court has never indicated that

the mere fact that an activity is sexual and private entitles it to protection as a

fundamental right.

The Supreme Court's most recent opportunity to recognize a fundamental

right to sexual privacy came in Lawrence v. Texas, where petitioners and amici

expressly invited the court to do so.[4]  That the Lawrence Court had declined the

invitation was this court's conclusion in our recent decision in Lofton v. Sec. of

Dept. of Children and Family Servs., 358 F.3d 804, 815-16 (11th Cir. 2004).  In

Lofton, we addressed in some detail the "question of whether Lawrence identified

---

[4] See Tr. of Oral Argument, No. 02-102, at *4; Br. of the ACLU et al. as Amici Curiae,
No. 02-102, at *11-25.

9

a new fundamental right to private sexual intimacy."[5] Id. at 815. We concluded that, although Lawrence clearly established the unconstitutionality of criminal prohibitions on consensual adult sodomy, "it is a strained and ultimately incorrect reading of Lawrence to interpret it to announce a new fundamental right"—whether to homosexual sodomy specifically or, more broadly, to all forms of sexual intimacy. Id. at 817. We noted in particular that the Lawrence opinion did not employ fundamental-rights analysis and that it ultimately applied rational-basis review, rather than strict scrutiny, to the challenged statute. Id. at 816-17.[6]

---

[5]See also Lofton v. Sec'y of the Dep't of Children and Family Servs., __ F.3d __, **\* 22-32** (11th Cir. 2004) (Birch, J., specially concurring in denial of rehearing en banc).

[6] Lofton stated in relevant part:

We are particularly hesitant to infer a new fundamental liberty interest from an opinion whose language and reasoning are inconsistent with standard fundamental-rights analysis. The Court has noted that it must "exercise the utmost care whenever [it is] asked to break new ground" in the field of fundamental rights, which is precisely what the Lawrence petitioners and their *amici curiae* had asked the Court to do. That the Court declined the invitation is apparent from the absence of the "two primary features" of fundamental-rights analysis in its opinion. First, the Lawrence opinion contains virtually no inquiry into the question of whether the petitioners' asserted right is one of "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Second, the opinion notably never provides the "'careful description' of the asserted fundamental liberty interest" that is to accompany fundamental-rights analysis. Rather, the constitutional liberty interests on which the Court relied were invoked, not with "careful description," but with sweeping generality. Most significant, however, is the fact that the Lawrence Court never applied strict scrutiny, the proper standard when fundamental rights are implicated, but instead invalidated the Texas statute on rational-basis grounds, holding that it "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual."

10

The dissent seizes on scattered *dicta* from <u>Lawrence</u> to argue that <u>Lawrence</u> recognized a <u>substantive</u> due process right of consenting adults to engage in private intimate sexual conduct, such that all infringements of this right must be subjected to strict scrutiny.[7]  As we noted in <u>Lofton</u>, we are not prepared to infer a new fundamental right from an opinion that never employed the usual <u>Glucksberg</u> analysis for identifying such rights.  <u>Id.</u> at 816.  Nor are we prepared to assume that <u>Glucksberg</u>—a precedent that <u>Lawrence</u> never once mentions—is overruled by implication.

_____

<u>Id.</u> at 816-17 (internal citations omitted).

[7] The dissent argues that certain declarations of the <u>Lawrence</u> Court signal a fundamental right, for example: "the Due Process Clause has a substantive dimension of *fundamental* significance in defining the rights of the person," <u>Lawrence</u>, 123 S. Ct. at 2477 (emphasis added); dissent at ___; and that "liberty gives substantial protection to adult persons in deciding how to *conduct their private lives in matters pertaining to sex,*" <u>id.</u> at 2480 (emphasis added); dissent at ___.  However, neither of these quoted excerpts from <u>Lawrence</u> support such a broad proposition when read in context.  The first quotation comes from the <u>Lawrence</u> Court's synopsis of <u>Roe</u>, which it mentioned in its survey of the privacy cases preceding <u>Bowers</u>.  123 S. Ct. at 2477 ("<u>Roe</u> recognized the right of a woman to make certain fundamental decisions affecting her destiny and confirmed once more that the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person.").  The second comes from the Court's discussion of how <u>Bowers</u> overstated the legal and historical condemnation of homosexual conduct, failing to recognize the "emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex."  <u>Id.</u> at 2480 ("This emerging recognition should have been apparent when <u>Bowers</u> was decided.").
It is telling that the best support for the fundamental-right-to-sexual-intimacy interpretation of <u>Lawrence</u> must be assembled from bits of *dicta*.  It is equally telling the dissent cites no language from the opinion—much less language articulating a rule of law—that states with any precision the right that <u>Lawrence</u> purportedly held to exist, or the standard of review that it triggers.  Instead, the dissent characterizes our analysis as "demeaning and dismissive" yet fares little better in its attempt to overstate the effect of the Alabama law on the day-to-day sexual activities of consenting adults in their homes.

11

The dissent in turn argues that the right recognized in Lawrence was a longstanding right that preexisted Lawrence, thus obviating the need for any Glucksberg-type fundamental rights analysis. But the dissent never identifies the source, textual or precedential, of such a preexisting right to sexual privacy. It does cite Griswold, Eisenstadt, Roe, and Carey. However, although these precedents recognize various substantive rights *closely related* to sexual intimacy, none of them recognize the overarching right to sexual privacy asserted here. Griswold, (marital privacy and contraceptives); Eisenstadt (equal protection extension of Griswold); Roe (abortion); Carey (contraceptives). As we noted above, in the most recent of these decisions, Carey, the Court specifically observed that it had not answered the question of whether there is a constitutional right to private sexual conduct.[8] 431 U.S. at 688 n.5, 97 S. Ct. at 2018 n.5. Moreover,

---

[8]Contrary to the dissent's accusation that "[t]he majority refuses . . . to acknowledge why the Court in Lawrence held that criminal prohibitions on consensual sodomy are unconstitutional," we have refused to do no such thing. What we have refused to do, as we suggest the dissent has done, is to create a rationale that was not articulated as to the "why" for the ruling. The operative legal conclusion that we come to as a basis for the decision in Lawrence is that Texas's sodomy prohibition did not further a legitimate state interest. Lawrence, 539 U.S. __, __, 123 S. Ct. 2472, 2484; Lofton v. Sec. of Dep't of Children and Family Servs., __ F.3d __, __ (11th Cir. 2004) (Birch, J., specially concurring in denial of rehearing en banc). We appreciate that the dissent does not agree with our analysis, but we have not "refused" to answer the dissent's question—notably, nobody else in the litigation has posed the question.

The dissent also flatly states that the Lawrence Court rejected public morality as a legitimate state interest that can justify criminalizing private consensual sexual conduct, but this conclusion ignores the obvious difference in what this statute forbids and the prohibitions of the Texas statute. There is nothing "private" or "consensual" about the advertising and sale of a dildo. And such advertising and sale is just as likely to be exhibited to children as to "consenting

12

nearly two decades later, the Glucksberg Court, listing the current catalog of fundamental rights, did not include such a right. 521 U.S. at 720, 117 S. Ct. at 2267.

In short, we decline to extrapolate from Lawrence and its *dicta* a right to sexual privacy triggering strict scrutiny. To do so would be to impose a fundamental-rights interpretation on a decision that rested on rational-basis grounds, that never engaged in Glucksberg analysis, and that never invoked strict scrutiny. Moreover, it would be answering questions that the Lawrence Court

---

adults." Moreover, the Supreme Court has noted on repeated occasions that laws can be based on moral judgments. See Barnes v. Glen Theatre, 501 U.S. 560, 569, 111 S. Ct. 2456, 2462 (1991) (upholding a public indecency statute, stating, "This and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation"); id. (noting that "a legislature could legitimately act . . . to protect 'the social interest in order and morality'") (citation omission); Gregg v. Georgia, 428 U.S. 153, 183, 96 S. Ct. 2909, 2930 (1976) (plurality opinion) (upholding the death penalty, noting that "capital punishment is an expression of society's moral outrage at particularly offensive conduct"); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61, 93 S. Ct. 2628, 2637 (1973) (holding that Georgia had a legitimate interest in regulating obscene material because the legislature "could legitimately act . . . to protect 'the social interest in order and morality'") (quoting Roth v. United States, 354 U.S. 476, 485, 77 S. Ct 1304, 1309 (1957)); United States v. Bass, 404 U.S. 336, 348, 92 S. Ct. 515, 522 (1971) (noting that "criminal punishment usually represents the moral condemnation of the community"). In addition, our own recent precedent has unequivocally affirmed the furtherance of public morality as a legitimate state interest. See, e.g., Williams v. Pryor, 240 F.3d 944, 949 (11th Cir. 2001) ("The crafting and safeguarding of public morality has long been an established part of the States' plenary police power to legislate and indisputably is a legitimate government interest under rational basis scrutiny."); see also id. at 949 n.3 ("In fact, the State's interest in public morality is sufficiently substantial to satisfy the government's burden under the more rigorous intermediate level of constitutional scrutiny applicable in some cases."). One would expect the Supreme Court to be manifestly more specific and articulate than it was in Lawrence if now such a traditional and significant jurisprudential principal has been jettisoned wholesale (with all due respect to Justice Scalia's ominous dissent notwithstanding).

13

appears to have left for another day. Of course, the Court may in due course expand <u>Lawrence</u>'s precedent in the direction anticipated by the dissent. But for us preemptively to take that step would exceed our mandate as a lower court.[9]

## B. <u>Glucksberg</u> Analysis

Because the ACLU is seeking recognition of a right neither mentioned in the Constitution nor encompassed within the reach of the Supreme Court's existing fundamental-right precedents, we must turn to the two-step analytical framework that the Court has established for evaluating new fundamental-rights claims. <u>See</u> <u>Glucksberg</u>, 521 U.S. at 720-21, 117 S. Ct. at 2268. First, in analyzing a request for recognition of a new fundamental right, or extension of an existing one, we "must begin with a careful description of the asserted right." <u>Reno v. Flores</u>, 507 U.S. 292, 302, 113 S. Ct. 1439, 1447 (1993); <u>see also</u> <u>Glucksberg</u>, 521 U.S. at 721, 117 S. Ct. at 2268. Second, and most critically, we must determine whether this asserted right, carefully described, is one of "those fundamental rights and liberties

---

[9]The dissent indicates that "even under the majority's own constrained interpretation of <u>Lawrence</u>, we are, at a bare minimum, obliged to revisit [our] previous conclusion in <u>Williams v. Pryor</u>, 240 F.3d 944 (11th Cir. 2001) ("<u>Williams II</u>")" that this law has a rational basis in light of <u>Lawrence</u>'s overruling of <u>Bowers</u> and our reliance in <u>Williams II</u> "on the now defunct *Bowers* to conclude that public morality provides a legitimate state interest." Dissent at ___. We agree with the dissent that, on remand, the district court, after considering the appropriate submissions of the parties, may examine "whether our holding in <u>Williams II</u> that Alabama's law has a rational basis (e.g., public morality) remains good law now that <u>Bowers</u> has been overruled." <u>Id.</u> at ___, n.25. We save for a later day consideration of whether Justice Scalia's ominous (and perhaps ominous) predication that public morality may no longer serve as a rational basis for legislation after <u>Lawrence</u>.

14

which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  Glucksberg, 521 U.S. at 720-21, 117 S. Ct. at 2268 (internal citations and quotation marks omitted).

This analysis, as the Supreme Court has stressed, must proceed with "utmost care" because of the dangers inherent in the process of elevating extra-textual rights to constitutional status, thereby removing them from the democratic field of play:

> By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.  We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of this Court.

Id. at 720, 117 S. Ct. at 2267-68 (internal citations and quotation marks omitted). The mandate to proceed carefully applies with added force when venturing into terrain where the Supreme Court itself has tread lightly, as it has here.  As we explain, the district court failed to exercise this "utmost care" in conducting the two-pronged Glucksberg analysis.

1. Careful Description

As we noted in Williams II, the district court's initial opinion "narrowly framed the analysis as the question whether the concept of a constitutionally

15

protected right to privacy protects an individual's liberty to use sexual devices when engaging in lawful, private, sexual activity." 240 F.3d at 953 (internal quotation marks omitted). On appeal, we affirmed this formulation, stating that "the district court correctly framed the fundamental rights analysis in this case." Id. However, on remand, the district court abandoned its initial, careful framing of the issue and instead characterized the asserted right more broadly as a generalized "right to sexual privacy." Williams III, 220 F.Supp.2d at 1277 (emphasis omitted).[10]

In searching for, and ultimately finding, this right to sexual privacy, the district court did little to define its scope and bounds. As formulated by the district court, the right potentially encompasses a great universe of sexual activities, including many that historically have been, and continue to be, prohibited. At oral arguments, the ACLU contended that "no responsible counsel" would challenge prohibitions such as those against pederasty and adult incest under a "right to sexual privacy" theory. However, mere faith in the responsibility of the bar

---

[10]Although our Williams II opinion indicated from the outset that the district court's initial narrow framing of the right was the proper approach, 240 F.3d at 953, we note that it created a degree of ambiguity by making a subsequent shorthand reference to this right as "a fundamental right to sexual privacy," id. at 955. It appears that this imprecision in our language was, at least in part, the source of the district court's over-broad framing of the right on remand. Williams III, 220 F.Supp.2d at 1276.

scarcely provides a legally cognizable, or constitutionally significant, limiting

principle in applying the right in future cases.[11]

The sole limitation provided by the district court's ruling was that the right

would extend only to *consenting adults*. Id. at 1294. The consenting-adult

formula, of course, is a corollary to John Stuart Mill's celebrated "harm principle,"

which would allow the state to proscribe only conduct that causes identifiable harm

to another. See generally John Stuart Mill, On Liberty (Elizabeth Rapaport ed.,

Hackett Pub. Co. 1978) (1859)). Regardless of its force as a policy argument,

however, it does not translate *ipse dixit* into a constitutionally cognizable standard.

See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 68, 93 S. Ct. 2628, 2641 (1973)

("[F]or us to say that our Constitution incorporates the proposition that conduct

involving consenting adults only is always beyond state regulation, is a step we are

unable to take.").

If we were to accept the invitation to recognize a right to sexual intimacy,

this right would theoretically encompass such activities as prostitution, obscenity,

and adult incest—even if we were to limit the right to consenting adults. See, e.g.,

id. at 68 n.15, 93 S. Ct. at 2641 n.15 ("The state statute books are replete with

---

[11] As Thomas Jefferson noted, "In questions of power, then, let no more be heard of confidence in man, but bind him down from mischief by the chains of the Constitution." Thomas Jefferson, Draft Kentucky Resolutions, 1798. Although usually invoked in slightly different contexts, this principle—that, in our republican system, we do not entrust constitutional limitations to human good will or self-restraint—has equal force here.

17

constitutionally unchallenged laws against prostitution, suicide, voluntary self-mutilation, brutalizing 'bare fist' prize fights, and duels, although these crimes may only directly involve 'consenting adults.'").  This in turn would require us to subject all infringements on such activities to strict scrutiny.  Glucksberg, 521 U.S. at 721, 117 S. Ct. at 2268.  In short, by framing our inquiry so broadly as to look for a general right to sexual intimacy, we would be answering many questions not before us on the present facts.

Indeed, the requirement of a "careful description" is designed to prevent the reviewing court from venturing into vaster constitutional vistas than are called for by the facts of the case at hand.  See Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 501, 105 S.Ct. 2794, 2801 (1985).  One of "the cardinal rules" of constitutional jurisprudence is that the scope of the asserted right—and thus the parameters of the inquiry—must be dictated "by the precise facts" of the immediate case.  Id.; see also Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261, 277-78, 110 S. Ct. 2841, 2851 (1990) ("[I]n deciding a question of such magnitude and importance it is the better part of wisdom not to attempt, by any general statement, to cover every possible phase of the subject.") (citation and internal punctuation omitted).

18

Glucksberg and Flores, cases in which the Court was asked to expand certain substantive due process rights, are instructive examples. In Glucksberg, the lower court and the petitioners had variously characterized the asserted right as "a liberty interest in determining the time and manner of one's death," 521 U.S. at 722, 117 S. Ct. at 2269, "a liberty to choose how to die and a right to control one's final days," id., and the "liberty of competent, terminally ill adults to make end-of-life decisions free of undue government interference," id. at 724, 117 S. Ct. at 2269. The Court rejected these characterizations as overbroad, noting its "tradition of carefully formulating the interest at stake in substantive-due-process cases." Id. at 722, 117 S.Ct. 2269. Then, looking to the specific statute under challenge—a ban on assisted suicide—the Court recast the asserted right as "a right to commit suicide which itself includes a right to assistance in doing so," id., or as "a right to commit suicide with another's assistance," id. at 724, 117 S.Ct. 2269.

Under challenge in Flores was an immigration regulation that governed the detention and release of alien juveniles. 507 U.S. at 294-98, 113 S. Ct. at 1443-45. The respondents, a class of detained alien juveniles, argued that the regulation violated their "fundamental right to freedom from physical restraint." Id. at 299, 113 S. Ct. at 1446 (internal quotation marks omitted). The Supreme Court, emphasizing the importance of beginning substantive-due-process analysis with a

19

"careful description," rejected respondents' broad formulation of the implicated

liberty interests.  507 U.S. at 302, 113 S. Ct. at 1447.  The Court then restated the

putative right—by careful reference to the challenged regulation:

> The "freedom from physical restraint" invoked by respondents is not at issue in this case. . . .  Nor is the right asserted the right of a child to be released from all other custody into the custody of its parents, legal guardian, or even close relatives:  The challenged regulation requires such release when it is sought.  Rather, the right at issue is the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution.

Id. (internal citations omitted).

As in Glucksberg and Flores, the scope of the liberty interest at stake here

must be defined in reference to the scope of the Alabama statute.  We begin by

observing that the broad rights to "privacy" and "sexual privacy" invoked by the

ACLU are not at issue.  The statute invades the privacy of Alabama residents in

their bedrooms no more than does any statute restricting the availability of

commercial products for use in private quarters as sexual enhancements.[12]  Instead,

---

[12]The mere fact that a product is used within the privacy of the bedroom, or that it enhances intimate conduct, does not in itself bring the use of that article within the right to privacy.  If it were otherwise, individuals whose sexual gratification requires other types of material or instrumentalities—perhaps hallucinogenic substances, depictions of child pornography or bestiality, or the services of a willing prostitute—likewise would have a colorable argument that prohibitions on such activities and materials interfere with their privacy in the bedchamber.  Under this theory, all such sexual-enhancement paraphernalia (as long as it was used only in consensual encounters between adults) would also be encompassed within the right to privacy—and any burden thereon subject to strict scrutiny.

20

the challenged Alabama statute bans the commercial distribution of sexual devices.[13]  At a minimum, therefore, the putative right at issue is the right to sell and purchase sexual devices.

It is more than that, however.  For purposes of constitutional analysis, restrictions on the ability to purchase an item are tantamount to restrictions on the use of that item.  Thus it was that the Glucksberg Court analyzed a ban on *providing* suicide assistance as a burden on the right to *receive* suicide assistance. 521 U.S. at 723, 117 S. Ct. at 2269.  Similarly, prohibitions on the *sale* of contraceptives have been analyzed as burdens on the *use* of contraceptives.  Carey, 431 U.S. at 688, 97 S. Ct. at 2018 ("[T]he same test must be applied to state regulations that burden an individual's right . . . by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely.").  Because a prohibition on the distribution of sexual devices would burden an individual's ability to use the devices, our analysis must be framed not simply in terms of whether the Constitution protects a right to *sell* and *buy* sexual devices, but whether it protects a right to *use* such devices.

2. "History and Tradition" and "Implicit in the Concept of Ordered Liberty"

---

[13]Advocating that public morality should no longer be a "rational basis to restrict private sexual activity," the dissent seeks to ignore that the legislation at issue bans by its express terms only the unsavory advertising and sale of sexual devices that the majority of the people of Alabama may well find morally offensive.  The fact remains that the complainants here continue to possess and use such devices, burdened only by inconvenient access.

21

With this "careful description" in mind, we turn now to the second prong of the fundamental-rights inquiry. The crucial inquiry under this prong is whether the right to use sexual devices when engaging in lawful, private sexual activity is (1) "objectively, deeply rooted in this Nation's history and tradition" and (2) "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." Glucksberg, 521 U.S. at 721, 117 S.Ct. at 2268 (citations omitted). Although the district court never addressed the second part of this inquiry, it answered the "history and tradition" question in the affirmative.

We find that the district court, in reaching this conclusion, erred on four levels. The first error relates back to the district court's over-broad framing of the asserted right in question. Having framed the relevant right as a generalized "right to sexual privacy," the district court's history and tradition analysis consisted largely of an irrelevant exploration of the history of sex in America. Second, we find that this analysis placed too much weight on contemporary practice and attitudes with respect to sexual conduct and sexual devices. Third, rather than look for a history and tradition of *protection* of the asserted right, the district court asked whether there was a history and tradition of state *non-interference* with the right. Finally, we find that the district court's uncritical reliance on certain expert

22

declarations in interpreting the historical record was flawed and that its reliance on certain putative "concessions" was unfounded.

### a. The Scope of the District Court's History and Tradition Analysis

The district court began its Glucksberg-mandated history and tradition inquiry by defining its task as one of determining whether to "recognize a fundamental right to sexual privacy." Williams III, 220 F.Supp.2d at 1277. After an extensive survey of the history of sex in American culture and law—replete with cites to the Kinsey studies and Michel Foucault—the district court concluded that "there exists a constitutionally inherent right to sexual privacy that firmly encompasses state non-interference with private, adult, consensual sexual relationships." Id. at 1296. As examined above, the Supreme Court's own reticence in this area, and its admonition to carefully define the right at stake, convince us that the district court erred in undertaking to find a generalized "right to sexual privacy." Given this over-broad starting point, the district court's subsequent inquiry, predictably, was likewise broader than called for by the facts of the case. The inquiry should have been focused not broadly on the vast topic of sex in American cultural and legal history, but narrowly and more precisely on the treatment of *sexual devices* within that history and tradition.

### b. The District Court's Focus on "Contemporary Practice"

23

In reaching its holding, the district court relied heavily on "contemporary practice," emphasizing the "contemporary trend of legislative and societal liberalization of attitudes toward consensual, adult sexual activity."  Id. at 1294; see generally id. at 1289-94; see also id. at 1296 (holding that "there is a 'history, legal tradition, and practice' in this country of deliberate state non-interference with private sexual relationships between married couples, and a *contemporary practice* of the same between unmarried persons") (emphasis added) (citation omitted).

Our first concern is the legal significance, or the lack thereof, of much of the district court's source material for this contemporary practice.  In addition to invoking a cluster of Supreme Court precedents touching on matters of procreation and familial integrity, the district court looked to social science data respecting premarital intercourse, marriage and divorce rates, and the like.  Id. at 1290.  It further noted the revolutionary impact of the Kinsey studies, the "imagery and implements of adult sexual relationships [that] pervade modern American society," the availability of "pornography of the grossest sort," and the "widespread marketing of Viagra (including by such notable personalities as former United States Senate Majority Leader and 1996 Republican presidential candidate Robert J. Dole and popular NASCAR driver Mark Martin)."  Id. at

1294. While such evidence undoubtedly confirms the district court's discovery of "the specter of a twentieth century sexual liberalism," id. at 1291, its relevance under Glucksberg is scant.

The district court justified this emphasis by noting that the Glucksberg Court had relied on contemporary practice in reaching its determination that assisted suicide is not a constitutional right. See, e.g., id. at 1275 (Glucksberg "considered current statutes, legislative debates, voter initiatives, and the positions of contemporary task forces and commissions on the issue of assisted suicide"). This gloss, however, considerably overstates that Court's reliance on contemporary attitudes. What the Glucksberg Court did was to note that democratic action in many states had recently reaffirmed assisted-suicide bans, thus buttressing the Court's conclusion that assisted suicide is not deeply rooted in the history and traditions of the nation. 521 U.S. at 716-19, 117 S.Ct. at 2265-67. But the existence of this contemporary practice was never essential to that conclusion. That is, the Court never suggested that a lack of contemporary *reinforcement* of the prohibition on assisted suicide would have led it to a contrary conclusion.

The district court's interpretation also overlooks the context of Glucksberg's contemporary practice analysis. The Court began its examination of

25

history and tradition by inquiring "whether this asserted right has *any place* in our Nation's traditions." Id. at 723, 117 S.Ct. at 2269 (emphasis added). Having found that it did not, the Court had no need to proceed to the further question of whether that right was *deeply rooted* in those traditions (nor whether it was "implicit in the concept of ordered liberty"). Part of the reason the Court was able to dismiss the asserted right so summarily was because it found that the prohibition on assisted suicide "continues explicitly" to the present. Id. In short, the democratic action cited by Glucksberg was merely one factor among many disproving the claim that assisted suicide is a "deeply rooted" right.[14]

c.      The District Court's Faulty Equation of Historical Non-Interference with Historical Protection

The district court's central holding—its discovery of a constitutional "right to use sexual devices like . . . vibrators, dildos, anal beads, and artificial vaginas"—was not based on any evidence of a history and tradition of *affirmative protection* of this right. Williams III, 220 F. Supp. 2d at 1296. The district court's lengthy opinion cites no reference to such a right in the usual repositories

---

[14]The focus on the trajectory of contemporary practice ultimately proves too much. The fact that there is an emerging consensus scarcely provides justification for the courts, who often serve as an antimajoritarian seawall, to be swept up with the tide of popular culture. If anything, it is added reason for us to permit the democratic process to take its course. See, e.g., Glucksberg, 521 U.S. at 735, 117 S.Ct. at 2275 ("Throughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide. Our holding permits this debate to continue, as it should in a democratic society.").

of our freedoms, such as federal and state constitutional provisions, constitutional doctrines, statutory provisions, common-law doctrines, and the like.  Instead, the critical evidence for the district court was the relative scarcity of statutes explicitly banning sexual devices and the rarity of reported cases of sexual-devices prosecutions—along with various factual assertions from declarations by the ACLU's experts.  From this, the district court inferred "that history and contemporary practice demonstrate a conscious avoidance of regulation of [sexual] devices by the states."  Id. at 1296.

This negative inference essentially inverted Glucksberg's history and tradition inquiry.  Glucksberg, 521 U.S. at 721, 117 S.Ct. at 2268.  The district court—rather than requiring a showing that the right to use sexual devices is "deeply rooted in this Nation's history and tradition," id.—looked for a showing that *proscriptions* against sexual devices are deeply rooted in history and tradition.  Under this approach, the freedom to smoke, to pollute, to engage in private discrimination, to commit marital rape—at one time or another—all could have been elevated to fundamental-rights status.  Moreover, it would create the perverse incentive for legislatures to regulate every area within their plenary power for fear that their restraint in any area might give rise to a right of constitutional proportions.

Beyond these obvious objections, the most significant flaw in the district court's analysis is its misreading of Glucksberg. Admittedly, the Glucksberg Court, in declining to extend constitutional protection to assisted suicide, cited the extensive history of laws forbidding or discouraging suicide. But the context of this inquiry was the Court's attempt to determine whether a right to suicide, and particularly assisted suicide, was deeply rooted in American history and tradition. Naturally, prohibitions on suicide were particularly competent evidence of the absence of such a history and tradition. The Glucksberg Court, however, never suggested that the reviewing court must find a history of proscription of a given activity before declining to recognize a new constitutional right to engage in that activity. Id. at 710-16, 117 S.Ct. at 2262-65; see also id. at 725, 117 S.Ct. at 2270 (rejecting the analogy between the constitutionally-protected right to refuse unwanted medical treatment and the asserted right to assisted suicide, noting that the former right "has never enjoyed similar legal protection").

In short, nothing in Glucksberg indicates that an absence of historical *prohibition* is tantamount, for purposes of fundamental-rights analysis, to an historical record of *protection* under the law. To the contrary, the Glucksberg standard expressly requires a showing that the asserted right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty,

28

such that neither liberty nor justice would exist if [it] were sacrificed." Id. at 721, 117 S.Ct. at 2268. Not only does the record before us fail to evidence such a deeply rooted right, but it suggests that, to the extent that sex toys historically have attracted the attention of the law, it has been in the context of proscription, not protection.

The chief example of this proscription is the "Comstock Laws," federal and state legislation adopted in the late 1800s. The federal Comstock Act of 1873 was a criminal statute directed at "the suppression of Trade in and Circulation of obscene Literature and Articles of immoral Use." See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 70, 103 S. Ct. 2875, 2882 (1983) (quoting Act of March 3, 1873, ch. 258, § 2, 17 Stat. 599 (1873)). The Act prohibited importation of and use of the mails for transporting, among other things, "every article or thing intended or adapted for any indecent or immoral use." United States v. Chase, 135 U.S. 255, 257, 10 S. Ct. 756, 756 (1890). Various states also enacted similar statutes prohibiting the sale of such articles. See, e.g., CONN. GEN. STAT. § 1325 (1902); MASS. GEN. LAWS ANN. ch. 272 § 21 (West 2004) (passed 1879).

The district court, however, discounted the significance of the Comstock laws, describing them as "aberrant to the sexual privacy" generally afforded to

29

consensual, adult sexual conduct. <u>Williams III</u>, 220 F.Supp.2d. at 1286. The district court cited expert declarations offered by the ACLU to the effect that the Comstock laws were not motivated primarily by a desire to ban sexual devices. <u>Id.</u> The district court further noted that searches of the annotations to the Comstock Act and of <u>Federal Cases</u> found no references to cases involving dildos and vibrators. <u>Id.</u> at 1287.

Even if these prohibitions on sexual devices were not widespread or vigorously enforced, their mere existence significantly undermines the argument that sexual devices historically have been free from state interference. Moreover, the lack of statutory references to sexual devices is relatively meaningless without evidence that commerce in these devices was sufficiently widespread, or sufficiently in the public eye, to merit legislative attention, at least beyond general anti-obscenity laws. Likewise, the focus on searches of federal case reporters for references to "vibrators" or "dildos" assumes, unjustifiably, that reported cases are reliable proxies for actual prosecutions, the vast majority of which would have never appeared in the court reporters (it also overlooks the possibility of prosecutions under *state* law). It also overlooks the possibility that traditional sensibilities and mores restrained courts from explicitly mentioning particular sexual devices in the text of judicial opinions.

30

In light of these realities, the negative inference drawn by the district court—that the scarcity of explicit reference to sexual devices in statutory schemes and reported cases reflects a "deliberate non-interference," id. at 1286—is too speculative a basis for constitutionalizing a hitherto unrecognized right. This is especially true given the lack of any indicia of affirmative protection under the law. In short, there is no competent evidence in the record before us indicating that the lack of explicit and aggressive proscription of sex toys was, as the district court surmised, "conscious avoidance of regulation of these devices by the states." Id. at 1296.

### d. The District Court's Handling of the Record

#### i. The District Court's Reliance on the ACLU's Expert Declarations

Finally, we note our recognition of the district court's uncritical acceptance of the bare assertions contained in the ACLU's expert declarations—particularly in reaching conclusions outside, or even in apparent contradiction to, the documented historical record.

This perfunctory reliance was especially pronounced in the district court's deconstruction of the Comstock laws. The mere existence of both federal and state Comstock laws—especially the federal Comstock Act, which expressly

31

prohibited importation and mail transport of "every article . . . for . . . immoral use"—seriously undermines the ACLU's fundamental-rights argument under Glucksberg. Instead, the district court's review of the Comstock laws led it to the conclusion that "[t]he popularity, legality, and ease of access to sexual devices like vibrators and dildos further demonstrate that the firm legislative respect for sexual privacy in the marital relationship extended to deliberate non-interference with adults' use of sexual devices within those relationships." Id. at 1286.

The sole support for this rather cursory conclusion appears to have been the assertions of one Rachel Maines, an historian and author, who submitted two separate expert declarations on the ACLU's behalf. R3-56, Ex. A; R4-84, Ex. 4. Her declarations offered criticism of the Alabama statute going well beyond her specific expertise and delving into the legal and policy dimensions of the case:

> Laws like Alabama's that target the appearance, packaging or marketing of [sexual] devices, rather than their functionality, thus do not prevent or mitigate the supposed "evil" of "commerce of sexual stimulation and auto-eroticism, for its own sake" (Brief of Alabama Attorney General, 21). Their effect is merely to benefit one set of retailers (drug stores, health food stores, and discount houses such as Walmart, GNC and Target) at the expense of another (marital aids vendors).

R3-56, Ex. A at 18-21.

> On the historical record, if devices "designed or marketed as useful primarily for the stimulation of the human genital organs" represent an evil and/or a moral threat to the citizens of

32

Alabama, the state has been remarkably dilatory in making this discovery, having waited for something more than two and a half millennia from the invention of the dildo and more than a century from the invention of the electromechanical vibrator to legislate against them. Apparently unconcerned about the availability of vibrators to consumers beginning in 1899, and even about their use in the production of orgasm in women, for which there was ample evidence by 1930, the state did not act against these devices until a small percentage of them took on anatomical forms, and until they began to be associated with a new interest in orgasmic mutuality in heterosexual relationships. Significantly, Viagra, which enhances sexual experience for men but not necessarily for women, is legal by prescription in all states, including those with laws against vibrators and dildos. As an historian and as a citizen, I fail to see what legitimate purpose is served by institutionalizing an hypocrisy in which the sale of a standard and traditional therapeutic device is rendered unlawful by sexual references in appearance, packaging or marketing.

Id. at 23-25.

Although Maines's statements suggest an agenda inconsistent with an unbiased and complete historical presentation, the district court nevertheless repeatedly relied on her factual assertions, usually without any independent verification. We note several typical examples:

● In downplaying the historical significance of the Comstock laws, the district court emphasized that "sexual devices were not the impetus for the so-called Comstock Acts." Williams III, 220 F. Supp. 2d at 1286. The only support for this statement was Maines's declaration statement that "vibrators and

33

dildoes [sic] were not significant motivations for the passage and enforcement of the Comstock Act." R4-84, Ex. 4 at 2. However, we find in neither Maines's declaration nor the record elsewhere any evidence—aside from Maines's bare assertion—of the actual motivation behind passage and enforcement of the Act.

- The record before the district court contained evidence that, according to records maintained by the New York Society for the Suppression of Vice, between 1871 and 1881, some 64,836 "Articles of immoral use, of rubber, etc." were seized under the Comstock Act and other anti-vice laws. See Anthony Comstock, Traps for the Young 137 (Robert Bremner ed., Harvard University Press 1967) (1884). The district court, however, dismissed this evidence by quoting Maines's claim that these "were almost all contraceptives." Williams III, 220 F. Supp. 2d at 1286; R4-84, Ex. 4 at 3. Although our own review of the record confirms that the articles "of rubber" likely represented many condoms, our concern is the district court's casual dismissal of contemporaneous documentary evidence in favor of retrospective, and unsupported, characterizations of that evidence. Further, although Maines cited several authorities for her assertion, our review of her

sources finds no support for the conclusion that the referenced articles "were almost all contraceptives."[15]

- The district court's central holding—its discovery of a constitutional "right to use sexual devices like . . . vibrators, dildos, anal beads, and artificial vaginas"—was based largely on unsupported statements from Maines's declarations. Williams III, 220 F. Supp. 2d at 1296. In divining this right, the district court concluded "that history and contemporary practice demonstrate a conscious avoidance of regulation of [sexual] devices by the states," Id. This conclusion was based on the "emergence and widespread acceptance" of the electric vibrator, id. at 1283, and "[t]he popularity, legality, and ease of access to sexual devices like vibrators and dildos," id. at 1286. These findings in turn relied on Maines's declarations, particularly her assertion that "[v]ibrators remained legal throughout this period, and were mailable matter under the Comstock laws of 1873 - 1914." Id. What both Maines's declaration and the district court's opinion omit is the fact that, according to Maines's own writings elsewhere, the vibrators available

---

[15] Heywood Broun & Margaret Leech, Anthony Comstock 92, 153 (1927); Charles G. Trumbull, Anthony Comstock, Fighter (1913); Anthony Comstock, Traps for the Young 137 (Robert Bremner ed., Belknap Press of Harvard Univ. Press 1967) (1884). Because Maines's did not provide a pinpoint citation for the Trumbull book, we did not review every page of the book, but our review of the relevant portions of the book did not reveal any support for Maines's assertion.

35

on the market during this period were general purpose vibrators marketed for non-sexual uses, such as massaging the hands, face, back, and neck.[16]  The fact that these general purpose vibrators were legal and mailable is hardly probative of the legality of sexual devices as sexual devices.

Because of our conclusion supra that the constitutionality of Alabama's statute does not hinge on the enforcement, or lack thereof, of the Comstock laws, any error by the district court in its incorporation of Maines's litigation-motivated and litigation-tailored assertions was harmless.  Nevertheless, the district court's truth-seeking duties should have compelled it to go behind Maines's assertions and

---

[16]Maines, in her writing outside the context of this litigation, notes that the first evidence of the availability of mass-market vibrators appears in 1899.  Rachel Maines, The Technology of Orgasm: "Hysteria," the Vibrator, and Women's Sexual Satisfaction 100 (1999).  Significantly, she states that most of these early "home vibrators" were marketed as health and beauty aids, particularly for home massage.  Id. at 19-20.  Consistent with this theory are the turn-of-the-century vibrator advertisements included with Maines's declaration, none of which suggest any sexual use for the devices.  R3-56, Ex. A at 19-24.  Even if, as Maines contends, there was some wink-and-nod encryption in these advertisements, this hardly supports the district court's conclusion that sexual devices qua sexual devices were widely available and openly marketed during this period.  Id.; see also Rachel Maines, Socially Camouflaged Technologies: The Case of the Electromagnetic Vibrator, TECH. AND SOC'Y MAGAZINE, June 1989, at 3.  Indeed, Maines further asserts that "[t]he social camouflage of the vibrator as a home and professional medical instrument seems to have remained more or less intact until the end of the 1920s" and that it was not until the vibrator reemerged in 1960s and 70s that "it was openly marketed as a sex aid." Maines, The Technology of Orgasm, at 20.

Thus, according to Maines's own book, vibrators have been available to the general public for only slightly over a century and—contrary to the district court's interpretation of Maines's declarations—explicitly sexually-oriented vibrators have been widely available and accepted for only the past four decades, at most.

satisfy itself of their reliability before relying on those assertions in recognizing a new fundamental constitutional right.[17]

Moreover, this uncritical reliance on Maines's assertions appears to have been typical of a larger pattern. For example, the district court's history and tradition discussion was largely a paraphrased version of the ACLU's motion for summary judgment and its factual support appears to have consisted entirely of the ACLU's pleadings and selective appendices of historical interpretations of sex throughout American history. Of the 104 supporting footnotes in the district court's history and tradition analysis, 99 were citations to these pleadings and appendices.

### ii. The District Court's Reliance on Alabama's "Concessions"

The district court's rationale for its wholesale adoption of the ACLU's evidence appears to have been its mistaken view that the Alabama Attorney General had conceded the ACLU's evidence on the history and tradition question. The district court, as preface to its Glucksberg history and tradition analysis, stated that "the court notes that it is extremely significant, if not dispositive, that the Attorney General concedes that 'there is little evidence to show that sexual

---

[17] Moreover, in granting summary judgment to the ACLU, the district court was obligated to view all evidence and factual inferences in the light most favorable to Alabama. Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1236 (11th Cir. 2003).

devices, or consensual sexual activities in general, have historically been subject to governmental regulation.'" Williams III, 220 F.Supp.2d. at 1277 (quoting Attorney General's Memorandum in Support of Motion for Summary Judgment, at 16).

This not only misquoted the Attorney General's actual language, but mischaracterized it as a "concession." In his memorandum supporting his motion for summary judgment, the Attorney General had devoted a section to describing Victorian-era proscriptions, and enforcement thereof, on sexual devices. R3-78 at 14-16. The following section began, "Although there is little *additional* evidence to show that sexual devices, or consensual sexual activities in general, have historically been subject to governmental regulation, there is also no evidence to show that these activities have been specially protected under the law." Id. at 16 (emphasis added). That section went on to mention some of that "additional evidence," such as efforts by the states to restrict sexual devices. Id. The district court's omission of the critical word "additional," as well as its out-of-context quotation of a prefatory dependent clause, significantly altered the meaning of a statement that, in proper context, appears in no way to have been intended as a concession of one of the most significant and contested issues in the case.

Similarly, the district court elsewhere stated: "The Attorney General concedes that 'there is no genuine dispute as to the historical chronology set forth by the plaintiffs' experts,' to the effect that there is a 'history or tradition of state non-interference in persons sex lives.'" Williams III, 220 F.Supp.2d. at 1276 (quoting Attorney General's Memorandum in Support of Motion for Summary Judgment, at 16).

In fact, the Attorney General conceded only to the *historical chronology* set forth by the ACLU's experts and the liberalization of attitudes towards sex that this chronology demonstrated. R3-78 at 12. However, the Attorney General never conceded a "history or tradition of state non-interference in persons sex lives." Significantly, the Attorney General's use of that phrase appeared four sentences prior to the "chronology" concession and itself was part of a sentence disputing the ACLU's version of history and tradition: "In attempting to demonstrate a 'history' or 'tradition' of state non-interference in persons' sex lives, [the ACLU's] experts have proffered a lengthy history of sexuality." Id. The district court's omission of the quotation marks surrounding "history" and "tradition" particularly distorted the Attorney General's meaning.

The district court's reliance on these "concessions" appears to have been substantial. In announcing its holding that the ACLU's evidence demonstrated a

39

fundamental right to sexual privacy, the district court stressed that "[t]he Attorney General has conceded plaintiffs' evidence in this regard." Williams III, 220 F.Supp.2d. at 1294; see also id. at 1295 ("Given the breadth, depth, volume, and weight of that evidence, and the Attorney General's concession, this court is compelled to agree [with plaintiffs-appellees]."); id. at 1295-96 (holding that, in light of the ACLU's evidence "and the concession to this evidence by the Attorney General, this court concludes that plaintiffs have met their burden").

To the contrary, the Attorney General's pleadings, while not disputing much of the ACLU's evidence about the liberalization of sexual norms, vigorously disputed both (a) the legal ramifications of that liberalization (e.g., that this liberalization, in itself, satisfied the fundamental-rights threshold) as well as (b) the contention that sexual devices had gone virtually unregulated throughout American history. R3-78 at 12-20. We conclude, however, that the district court's reliance on these putative concessions was, at worst, harmless error. The issues that the district court treated as having been conceded pertained to the existence of a fundamental right to sexual privacy, which, as we explained supra, was an over-broad framing of the inquiry in the first place.

### III. CONCLUSION

Hunting expeditions that seek trophy game in the fundamental-rights forest must heed the maxim "look before you shoot."  Such excursions, if embarked upon recklessly, endanger the very ecosystem in which such liberties thrive—our republican democracy.  Once elevated to constitutional status, a right is effectively removed from the hands of the people and placed into the guardianship of unelected judges.  See Glucksberg, 521 U.S. at 720, 117 S. Ct. at 2267-68.  We are particularly mindful of this fact in the delicate area of morals legislation.  One of the virtues of the democratic process is that, unlike the judicial process, it need not take matters to their logical conclusion.  If the people of Alabama in time decide that a prohibition on sex toys is misguided, or ineffective, or just plain silly, they can repeal the law and be finished with the matter.  On the other hand, if we today craft a new fundamental right by which to invalidate the law, we would be bound to give that right full force and effect in all future cases—including, for example, those involving adult incest, prostitution, obscenity, and the like.

The dissent eloquently quotes Justice Brandeis in its opening passages.  We find merit in the wisdom of Justice Felix Frankfurter in his concurring opinion in *Dennis v. United States*, 341 U.S. 494, 525, 71 S. Ct. 857, 875 (1951), when he observed:

> Courts are not representative bodies.  They are not designed to be a
> good reflex of a democratic society.  ... Their essential quality is

41

detachment, founded on independence.   History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.

For the reasons we have explained, we hold that the district court committed reversible error in concluding that the Due Process Clause "encompass[es] a right to use sexual devices like . . . vibrators, dildos, anal beads, and artificial vaginas." Williams III, 220 F. Supp. 2d. at 1296.  Moreover, we reject the ACLU's request that we redefine the constitutional right to privacy to cover the commercial distribution of sex toys.  We REVERSE the district court's grant of the ACLU's motion for summary judgment and REMAND to the district court for further proceedings consistent with this opinion.

BARKETT, Circuit Judge, dissenting:

The majority's decision rests on the erroneous foundation that there is no substantive due process right to adult consensual sexual intimacy in the home and erroneously assumes that the promotion of public morality provides a rational basis to criminally burden such private intimate activity. These premises directly conflict with the Supreme Court's holding in Lawrence v. Texas, 123 S. Ct. 2472 (2003).

This case is not, as the majority's demeaning and dismissive analysis suggests, about sex or about sexual devices. It is about the tradition of American citizens from the inception of our democracy to value the constitutionally protected right to be left alone in the privacy of their bedrooms and personal relationships. As Justice Brandeis stated in the now famous words of his dissent in Olmstead v. United States, 277 U.S. 438 (1928), when "[t]he makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness . . . [t]hey conferred, as against the government, the right to be let alone–the most comprehensive of rights and the right most valued by civilized men." 277 U.S. at 478 (Brandeis, J., dissenting) overruled by Berger v. State of New York, 388 U.S. 41 (1967); Katz v. United States, 389 U.S. 347 (1967).

The majority claims that Lawrence, like Bowers v. Hardwick, 478 U.S. 186 (1986), failed to recognize the substantive due process right of consenting adults to engage in private sexual conduct. Conceding that Lawrence must have done something, the majority acknowledges that Lawrence "established the unconstitutionality of criminal prohibitions on consensual adult sodomy." Majority Op. at *10. The majority refuses, however, to acknowledge why the Court in Lawrence held that criminal prohibitions on consensual sodomy are unconstitutional. This failure underlies the majority's flawed conclusion in this case.

As explained more fully below, Lawrence held that a state may not criminalize sodomy because of the existence of the very right to private sexual intimacy that the majority refuses to acknowledge. Lawrence reiterated that its prior fundamental rights cases protected individual choices "concerning the intimacies of [a] physical relationship." Lawrence, 123 S. Ct. at 2483 (internal quotation marks and citation omitted). Because of this precedent, the Lawrence Court overruled Bowers, concluding that Bowers had "misapprehended the claim of liberty there presented" as involving a particular sexual act rather than the broader right of adult sexual privacy. Id. at 2478. Instead of heeding the Supreme Court's instruction regarding Bowers' error, the majority repeats it, ignoring

44

Lawrence's teachings about how to correctly frame a liberty interest affecting sexual privacy.

Compounding this error, the majority also ignores Lawrence's holding that although history and tradition may be used as a "starting point," they are not the "ending point" of a substantive due process inquiry. Id. at 2480 (internal quotation marks and citation omitted). In cases solely involving adult consensual sexual privacy, the Court has never required that there be a long-standing history of affirmative legal protection of specific conduct before a right can be recognized under the Due Process Clause. To the contrary, because of the fundamental nature of this liberty interest, this right has been protected by the Court despite historical, legislative restrictions on private sexual conduct.[1] Applying the analytical framework of Lawrence compels the conclusion that the Due Process Clause protects a right to sexual privacy that encompasses the use of sexual devices.[2]

Finally, even under the majority's own constrained and erroneous interpretation of Lawrence, we are, at a bare minimum, obliged to revisit this

_____

[1] See Roe v. Wade, 410 U.S. 113, 139 (1973); see also Carey v. Population Services Int'l, 431 U.S. 678 (1977); Eisenstadt v. Baird, 405 U.S. 438 (1972); Griswold v. Connecticut, 381 U.S. 479 (1965).

[2] As the majority acknowledges, there is no constitutional distinction between a ban on the private use of sex toys and a ban on the sale of sex toys. See Majority Op. at *21 ("For purposes of constitutional analysis, restrictions on the ability to purchase an item are tantamount to restrictions on the use of that item."). Accordingly, Alabama cannot be permitted to accomplish indirectly what it is not constitutionally permitted to do directly.

45

Court's previous conclusion in <u>Williams v. Pryor</u>, 240 F.3d 944 (11th Cir. 2001) ("<u>Williams II</u>"), that Alabama's law survives the most basic level of review, that of rational basis.  <u>See</u> 240 F.3d at 949.  That decision explicitly depended upon the finding in <u>Bowers</u> that the promotion of public morality provided a rational basis to restrict private sexual activity.  <u>Id.</u>  While the majority recognizes that <u>Bowers</u> has been overruled, it inexplicably fails to offer any explanation whatsoever for why public morality provides a rational basis to criminalize the private sexual activity in this case, when it was clearly not found to be a legitimate state interest in <u>Lawrence</u>.

For all of these reasons, which are amplified below, I dissent.

## I. <u>Lawrence</u> Recognized a Substantive Due Process Right to Sexual Privacy.[3]

There is no question that <u>Lawrence</u> was decided on substantive due process grounds.  The doctrine of substantive due process requires, first, that <u>every</u> law must address in a relevant way only a legitimate governmental purpose.  In other words, no law may be arbitrary and capricious but rather must address a permissible state interest in a way that is rationally related to that interest.  As a

---

[3] I have also developed these arguments in my dissent to the denial of rehearing en banc in <u>Lofton v. Sec. of Dept. of Children and Family Servs.</u>, __ F.3d ___, (11th Cir. Jan. 28, 2004) (Barkett, J., dissenting).

consequence, any law challenged as violating a substantive due process right must survive rational-basis review.

However, the Supreme Court has found that some decisions are so fundamental and central to human liberty that they are protected as part of a right to privacy under the Due Process Clause,[4] and the government may constitutionally restrict these decisions only if it has more than an ordinary run-of-the-mill governmental purpose.[5] In such cases, the Court subjects these governmental restrictions to a heightened scrutiny, requiring that legislation be "narrowly drawn"

---

[4] The Supreme Court has explained that this right includes the ability of adults to make decisions relating to the right to abortion, Roe, 410 U.S. 113; contraception, Eisenstadt, 405 U.S. 438 and Griswold, 381 U.S. 479; marriage, Loving v. Virginia, 388 U.S. 1 (1967); family relationships, Prince v. Massachusetts, 321 U.S. 158 (1944); procreation, Skinner v. Oklahoma, 316 U.S. 535 (1942); and child rearing and education, Pierce v. Society of Sisters, 268 U.S. 510 (1925) and Meyer v. Nebraska, 262 U.S. 390 (1923).

[5] The majority acknowledges that at issue in this case is "the Due Process Clause's substantive component, which courts have long recognized as providing 'heightened protection against government interference with certain fundamental rights and liberty interests.'" Majority Op. at *7 (quoting Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000)).

47

to achieve a "compelling state interest."[6]  Included within this right to privacy is the ability to make decisions about intimate sexual matters.[7]

In invalidating the sodomy statute at issue in Lawrence, the Court reaffirmed this right to sexual privacy, finding that private homosexual conduct is likewise encompassed within it.  From its opening paragraph, the Court explained the importance of the liberty at issue here:

> Liberty protects the person from unwarranted government intrusions into a dwelling or other private places.  In our tradition the State is not omnipresent in the home.  And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence . . . The instant case involves liberty of the person both in its spatial and more transcendent dimensions.

Lawrence, 123 S. Ct. at 2475.  The Lawrence Court noted in its opinion that it had granted certiorari specifically to consider "[w]hether Petitioners' criminal convictions for adult consensual sexual intimacy in the home violate their vital interests in liberty and privacy protected by the Due Process Clause of the

---

[6] Roe, 410 U.S. at 155 ("Where certain fundamental rights are involved, the Court has held that regulation limiting these rights may be justified only by a compelling state interest" and that such legislation "must be narrowly drawn") (internal quotation marks and citation omitted). The only sexual privacy case where the Court did not use this language was in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992), where it analyzed civil burdens on a woman's right to abortion, not an outright criminal ban.  The Court found that a state regulation that had "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" would place an "undue burden" on the right to abortion and therefore be unconstitutional.  Casey, 505 U.S. at 877.

[7] See, e.g., Carey, 431 U.S. at 685 and Griswold, 381 U.S. at 486 (right to use contraception); Casey, 505 U.S. at 869 (right to seek out an abortion).

48

Fourteenth Amendment?" Id. at 2476 (internal quotation marks and citation omitted) (emphasis added). While the Court also granted certiorari to address whether Texas's sodomy statute violated the Equal Protection Clause,[8] the Court explicitly decided to rest its holding on a substantive due process analysis because it found that if a sodomy law "remain[ed] unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons."[9] Id. at 2482. The Court stated that the "case should be resolved by determining whether the petitioners were free as adults to engage in the private [sexual] conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment." Id. at 2476.

In resolving this issue of whether the petitioners were "free as adults" to engage in "private [sexual] conduct," the Court retraced its substantive due process jurisprudence by discussing the fundamental rights cases of Griswold, Eisenstadt,[10]

---

[8] Unlike the sodomy statute at issue in Lawrence, which only applied to homosexual sexual conduct, the Georgia statute in Bowers criminalized acts of sodomy engaged in by both heterosexuals and homosexuals. See Bowers, 478 U.S. at 188 n.1. The Lawrence Court indicated that the sodomy statute could have been invalidated using an equal protection analysis. 123 S. Ct. at 2482. Indeed, this was the conclusion of Justice O'Connor in her concurrence. Id. at 2484-88 (O'Connor, J., concurring).

[9] The Lawrence majority went on to state that "[w]hen homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." 123 S.Ct. at 2482.

[10]Although Eisenstadt was decided on equal protection grounds, the Court in Lawrence noted that Eisenstadt "went on to state the fundamental proposition that the law impaired the

49

Roe, and Carey and emphasized the breadth of their holdings as involving private decisions regarding intimate physical relationships.  Id. at 2476-77, 2483. Beginning with Griswold, the Lawrence Court found that its prior decisions confirmed "that the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person" and "that the right to make certain decisions regarding sexual conduct extends beyond the marital relationship."  Id. at 2477 (summarizing Griswold, Eisenstadt, Roe, and Carey).

Because of the existence of this right to make private decisions regarding sexual conduct, the Lawrence Court was compelled to overrule the anomaly of Bowers, which had failed to acknowledge this right in permitting Georgia to criminalize sodomy.  See Bowers, 478 U.S. at 194-96.  Lawrence found that at the time of the Bowers decision the Court's prior holdings had already made "abundantly clear" that individuals have a substantive due process right to make decisions "concerning the intimacies of their physical relationship[s], even when not intended to produce offspring."123 S. Ct. at 2483 (quoting Bowers, 478 U.S. at

exercise of . . . personal rights." 123 S. Ct. at 2477.  Further, while Lawrence cited Romer v. Evans, 517 U.S. 620 (1996), as an example of how Bowers had been cast into doubt, the Court immediately declined to decide the case under Romer's equal protection rationale, instead insisting that the decision be resolved on substantive due process grounds.  Id. at 2482.

50

216 (Stevens, J., dissenting)). The Lawrence Court therefore concluded that "Bowers was not correct when it was decided." Id. at 2484 (emphasis added).

Given these statements in Lawrence, I fail to understand the majority's reliance on a footnote from the Supreme Court's 1977 decision in Carey, where the Court indicated in dicta that it had not "definitively answered" the extent to which the Due Process Clause protects the private sexual conduct of consenting adults. Majority Op. at *9, 12 (citing Carey, 431 U.S. at 688 n.5).[11] Obviously, Carey does not resolve in any way the meaning of a case that comes twenty-six years later. Nor does it prevent Lawrence from answering the very question posed in Carey's footnote. Lawrence does precisely this in affirming the right of consenting adults to make private sexual decisions. Moreover, this could not have been a new right. Carey's footnote notwithstanding, the Lawrence Court determined that its pre-Bowers decisions had already recognized a right to sexual privacy. This is the only way to make sense of the Lawrence Court's statements that Bowers was "not correct when it was decided," and that its decisions before Bowers had already made "abundantly clear" that adults have a right to make decisions "concerning the

---

[11] In Carey, the Court wrote that it had "not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating (private consensual sexual) behavior among adults." 431 U.S. at 688 n.5 (internal quotation marks and citation omitted).

51

intimacies of their physical relationship[s]." Lawrence, 123 S. Ct. at 2483-84

(internal quotation marks and citation omitted).

In light of the Court's conclusion that its prior decisions in Griswold,

Eisenstadt, Carey, and Roe had already made "abundantly clear" that adults have a

right to make intimate decisions about their sexual relationships, the majority

cannot seriously maintain that this dissent "never identifies" a precedential source

of the right to sexual privacy. Majority Op. at *12. The majority's argument that

this dissent fails to identify a textual source of the right to sexual privacy is equally

untenable. Id. As noted below, the Lawrence Court held that the petitioners'

"right to liberty under the Due Process Clause gives them the full right to engage in

their [private sexual] conduct without intervention of the government." 123 S. Ct.

at 2484 (emphasis added). The Court could not have been more clear that the

petitioners' right to engage in private sexual conduct has its textual locus in the

Due Process Clause.

Bowers erred because it "misapprehended the claim of liberty there

presented" when it framed the issue before it as whether the Constitution protects

"a fundamental right to engage in consensual sodomy":

> To say that the issue in Bowers was simply the right to engage in certain
> sexual conduct demeans the claim the individual put forward, just as it
> would demean a married couple were it to be said marriage is simply about
> the right to have sexual intercourse. The laws involved in Bowers and here

52

are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home.

Lawrence, 123 S. Ct. at 2478 (emphasis added). In other words, Bowers departed from the proper inquiry by focusing on a particular sexual act instead of upon the right to sexual privacy, which encompasses acts of adult consensual sexual intimacy. As I explain in the next section, the majority repeats the very mistake made in Bowers by focusing on whether there is a right to engage in a particular sexual act – here the use of sexual devices – rather than asking whether the conduct burdened by Alabama's statute involves private consensual sexual intimacy. As Lawrence demonstrates, sexual intimacy is inevitably demeaned, and its importance to the private life of the individual trivialized, when it is reduced to a particular sexual or physical act.

As the Lawrence Court explained, the proper inquiry is simply whether adults have a right to engage in "private [sexual] conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment." Id. at 2476. In answering this question, Lawrence expressly adopted the reasoning of Justice Stevens' dissent in Bowers:

> [I]ndividual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause

53

of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.

Id. at 2483 (quoting Bowers, 478 U.S. at 216 (Stevens, J., dissenting)) (emphasis added). Because the private conduct at issue in Lawrence also concerned the "intimacies" of a "physical relationship," the Court held that the petitioners' "right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government."[12] Id. at 2484. The Lawrence Court's answer to its question of whether adults have a right to engage in private sexual conduct is clearly a binding holding. I know of no principle of interpretation that supports, in any way, the majority's characterization as

---

[12] The majority argues that acknowledging a right of adult sexual privacy would lead to the invalidation of laws banning, among other things, prostitution, incest, the use of hallucinogenic substances, child pornography, and bestiality. See Majority Op. at *18, 21 n.12. Here again, the majority fails to credit Lawrence, which clearly stated, for purposes of guiding future courts, what the right of consensual adult sexual privacy is and is not about:

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle.

123 S. Ct. at 2484 (emphasis added). As the Court explained, as a "general rule," the state or a court should not attempt "to define the meaning of [a] relationship or to set its boundaries absent injury to a person or abuse of an institution the law protects." Id. at 2478 (emphasis added). For example, in the case of prostitution, there may be a threat that individuals will be harmed, while adult incest poses a threat to the institution of the family and involves a "relationship[] where consent might not easily be refused." Id. at 2484.

54

"scattered dicta"[13] the Supreme Court's direct response to the question it granted certiorari to answer and that it found was necessary to resolve before disposing of the case. See id. at 2476 ("We conclude the case should be resolved by determining whether the petitioners were free as adults to engage in the private [sexual] conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment.").

Like both Bowers and Lawrence, this case involves "the most private human conduct, sexual behavior," occurring "in the most private of places, the home." Lawrence, 123 S. Ct. at 2478. Alabama's statute, by prohibiting the sale of sexual devices, thus affects the same "vital" liberty interest in adult consensual sexual intimacy threatened by the sodomy statutes in Bowers and Lawrence and should likewise be invalidated.[14] I believe the majority errs in its strained effort to avoid the fair import of a Supreme Court precedent.

II.   **The Majority Ignores Lawrence's Teaching Regarding the Proper Framing of a Liberty Interest and the Appropriate Use of History.**

---

[13] Majority Op. at *11.

[14] As the majority acknowledges, the Supreme Court has held that the "same test must be applied to state regulations that burden an individual's right . . . by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely." Majority Op. at *21-22 (quoting Carey, 431 U.S. at 688).

Because the majority erroneously concludes that <u>Lawrence</u> did not reaffirm a substantive due process right to sexual privacy, it attempts to conduct a <u>Glucksberg</u> analysis with respect to whether to recognize a "hitherto unarticulated fundamental right." Majority Op. at *6, 14. In doing so, the majority not only errs by proceeding as if <u>Lawrence</u> and its prescriptions for conducting a fundamental rights analysis do not exist, but also errs by inventing new criteria that are not supported by <u>Glucksberg</u>, <u>Flores</u>, or any other case law.[15]

Regardless of the majority's belief that <u>Lawrence</u> did not recognize a substantive due process right, it cannot then simply conduct an analysis that ignores <u>Lawrence</u>'s clear statements about the erroneous analytical framework of <u>Bowers</u> and repeat that methodology here. Even if <u>Lawrence</u> were not itself a fundamental rights decision, it remains the case that <u>Bowers</u> conducted a fundamental rights analysis that <u>Lawrence</u> found to be deeply flawed. <u>Lawrence</u>'s repudiation of <u>Bowers</u>' substantive due process approach cannot be dismissed as dicta, since overruling <u>Bowers</u> was necessary to the disposition of the decision in <u>Lawrence</u>. <u>Lawrence</u>, 123 S. Ct. at 2476 ("[W]e deem it necessary to reconsider the Court's holding in <u>Bowers</u>."). Therefore, <u>Lawrence</u>, coming after <u>Glucksberg</u>,

---

[15]<u>See</u> <u>Washington v. Glucksberg</u>, 521 U.S. 702 (1997); <u>Reno v. Flores</u>, 507 U.S. 292 (1993).

56

must be read as providing binding guidance about how to properly analyze a liberty interest affecting sexual privacy.

## A. The Proper Framing of a Liberty Interest

Just as the Bowers Court framed the question before it as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy," Bowers, 478 U.S. at 190, the majority also mistakenly reduces the asserted liberty interest here to a particular sexual act, asking not whether consenting adults have a right to sexual privacy, but whether an Alabama citizen has the right to use sex toys.[16] See, e.g., Majority Op. at *22. The Lawrence Court explained that the narrow framing of the question in Bowers "demean[ed] the claim" set forth and "disclose[d] the Court's own failure to appreciate the extent of the liberty at stake" in that case. 123 S. Ct. at 2478 (Bowers "misapprehended the claim of liberty there presented to it"). The Lawrence Court further explained that

---

[16] The majority erroneously insists that "the scope of the liberty interest at stake here must be defined in reference to the scope of the Alabama statute," Majority Op. at *20, even though Lawrence recognized that the liberty interest threatened by sodomy statutes could not be defined by the particular conduct those statutes prohibited. Selectively quoting from the district court's opinion, the majority repeatedly insists that the right at issue here is the "right to use sexual devices like . . . vibrators, dildos, anal beads, and artificial vaginas." Majority Op. at *27, 35, 42. In contrast to the majority, the district court properly framed the question in terms of the broader right to sexual privacy. The district court framed the inquiry as follows: "Does th[e] fundamental right of sexual privacy between married and unmarried adults in private, consensual, sexual relationships encompass a right to use sexual devices like the vibrators, dildos, anal beads, and artificial vaginas distributed by the vendor plaintiffs in this action?" Williams v. Pryor, 220 F. Supp. 2d 1257, 1296 (N.D. Ala. 2002) ("Williams III").

57

"[t]he laws involved in <u>Bowers</u> and here are, to be sure, statutes that <u>purport to do no more than prohibit a particular sexual act</u>.  Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home."  <u>Id.</u> at 2478 (emphasis added).  In exactly the same manner, the majority's characterization of the right at issue here as involving the right to use certain sexual devices severely discounts the extent of the liberty at stake in this case.  Alabama's law not only restricts the sale of certain sexual devices, but, like the statute in <u>Lawrence</u>, burdens private adult sexual activity within the home.[17]

## B.  The Use of History and Tradition

In addition to repeating the analytical mistake of <u>Bowers</u> in narrowly framing the right at issue, the majority also errs in its use of history.  The majority claims that under <u>Glucksberg</u>, the district court was wrong to rely on a history and tradition of state <u>non-interference</u> with the private sexual lives of adults as a basis to recognize a right to sexual privacy.[18]  According to the majority, <u>Glucksberg</u>

---

[17] <u>See</u> Majority Op. at *21 ("For purposes of constitutional analysis, restrictions on the ability to purchase an item are tantamount to restrictions on the use of that item.").

[18] The district court found that "history and contemporary practice demonstrate a conscious avoidance of regulation of [sexual] devices by the states."  <u>Williams III</u>, 220 F. Supp. 2d at 1296.  The majority dismisses this analysis.  <u>See</u> Majority Op. at *23 ("[R]ather than look for a history and tradition of *protection* of the asserted right, the district court asked whether there was a history and tradition of state *non-interference* with the right.").

58

requires that there be a long-standing history of <u>affirmative</u> legal protection of <u>specific conduct</u> before a right can be recognized under the Due Process Clause.[19]

Contrary to the majority's claim, neither <u>Glucksberg</u> nor any other relevant Supreme Court precedent supports the requirement that there must be a history of affirmative legislative protection before a right can be judicially protected. The majority simply invents this requirement, effectively redefining the doctrine of substantive due process to protect only those rights that are <u>already</u> explicitly protected by law. Such a requirement ignores not only <u>Lawrence</u> but also a complete body of Supreme Court jurisprudence. Had the Supreme Court required affirmative governmental protection of an asserted liberty interest, all of the Court's privacy cases would have been decided differently. For instance, there was no lengthy tradition of protecting abortion and the use of contraceptives, yet both were found to be protected by a right to privacy under the Due Process Clause.[20] In its analysis, the trial court here correctly considered the history of non-

---

[19] Majority Op. at *27 (noting that the district court's analysis was "not based on any evidence of a history and tradition of *affirmative protection* of this right [to use sexual devices]").

[20] In <u>Roe</u>, for instance, the Court's historical analysis of Anglo-American statutory and common law served to provide evidence of the relatively recent (late nineteenth-century) vintage of state restrictions on abortion, not to demonstrate a tradition of affirmative protection of the right to an abortion. 410 U.S. at 132-41. Despite the lack of a history of protecting the right to abortion, the <u>Roe</u> Court nevertheless held that the "right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." <u>Id.</u> at 152-56.

59

interference by government. Its analysis was expressly validated by Lawrence, in which there was no history of affirmatively protecting the right to engage in consensual sodomy. In overruling Bowers, the Lawrence Court noted with approval Justice Powell's observation in Bowers that "[t]he history of nonenforcement [of sodomy laws] suggests the moribund character today of laws criminalizing this type of private, consensual conduct." 123 S. Ct. at 2481 (internal quotation marks and citation omitted) (emphasis added). Therefore, the majority is plainly incorrect that there must be a history and tradition of laws protecting the right to use sex toys.[21]

Moreover, while history and tradition can be important factors, they are not the only relevant considerations in a substantive due process inquiry related to sexual privacy. See id. at 2480-81. As the Lawrence Court emphasized, "[h]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." Id. at 2480 (internal quotation marks and citation omitted). Furthermore, like the district court in this case, Lawrence looked to modern trends and practices. The Lawrence Court wrote:

---

[21] The majority also claims that the district court should have limited its historical analysis to legislation involving the use of sexual devices. The proposal for such an unjustifiably narrow inquiry flows from the majority's error in framing the right at issue too narrowly.

60

[W]e think that <u>our laws and traditions in the past half century are of most relevance here</u>. These references show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to <u>conduct their private lives in matters pertaining to sex</u>.

<u>Id.</u> (emphasis added).  Given this unequivocal statement, the majority cannot legitimately criticize the district court for its attention to "contemporary practice and attitudes with respect to sexual conduct and sexual devices."  Majority Op. at *23.  In light of all relevant Supreme Court precedents, the trial court – not the majority – strikes the proper balance between a concern with history and contemporary practice, and articulates a careful and correct description of the asserted liberty interest.[22]

## III.    Under <u>Lawrence</u>, "Public Morality" Cannot Be Deemed a Legitimate Governmental Purpose for Criminalizing Private Sexual Activity.

The majority states that <u>Lawrence</u> held that sodomy laws fail rational-basis review.[23]  However, the majority neglects to address whether Alabama's statute has a rational basis even though Alabama relies upon the same justification for criminalizing private sexual activity rejected by <u>Lawrence</u> – public morality.  In <u>Lawrence</u>, Texas had explicitly relied upon public morality as a rational basis for

---

[22] <u>Williams III</u>, 220 F. Supp. 2d at 1259, 1296 ("[P]laintiffs' evidence establishes that there exists a constitutionally inherent right to sexual privacy that firmly encompasses state *non-interference* with private, adult, consensual sexual relationships" and that this right, "even in its narrowest form, protects plaintiffs' use of sexual devices like those targeted" by Alabama's law).

[23] Majority Op. at *10 (noting that <u>Lawrence</u> "ultimately applied rational-basis review" to strike down Texas's sodomy statute).

its sodomy law.[24]  Lawrence summarily rejected Texas's argument, holding that the

sodomy law "further[ed] no legitimate state interest which can justify its intrusion

into the personal and private life of the individual."  123 S. Ct. at 2484 (emphasis

added).  In Williams II, this Court previously upheld Alabama's law on rational

basis grounds, relying on the now defunct Bowers to conclude that public morality

provides a legitimate state interest.  240 F.3d at 949-50 (the "crafting and

safeguarding of public morality has long been an established part of the States'

plenary police power to legislate and indisputably is a legitimate government

interest under rational basis scrutiny").  Obviously, now that Bowers has been

overruled, this proposition is no longer good law and we must, accordingly, revisit

our holding in Williams II.[25]  Yet despite the Lawrence Court's rejection of public

---

[24] Respondent's Brief in Lawrence, 2003 WL 470184 at *48 ("The prohibition of homosexual conduct in [Texas' sodomy statute] represents the reasoned judgment of the Texas Legislature that such conduct is immoral and should be deterred . . . . [L]ong-established principles of federalism dictate that the Court defer to the Texas Legislature's judgment and to the collective good sense of the people of the State of Texas, in their effort to enforce public morality and promote family values through the promulgation of penal statutes such as [the sodomy statute].") (internal footnote omitted) (emphasis added); see also Transcript of Oral Argument in Lawrence, 2003 WL 1702534 at *38 (state's counsel arguing that sodomy law was justified because "Texas has the right to set moral standards and can set bright line moral standards for its people.").

[25] The majority states that "[t]he only question on this appeal is whether the [Alabama] statute, as applied to the involved users and vendors, violates any fundamental right protected under the Constitution."  Majority Op. at *5-6.  Appellants, however, claim that Alabama's statute violates the Due Process Clause, which necessarily includes a claim that the statute fails rational-basis review.  On remand, the district court must consider whether our holding in Williams II that Alabama's law has a rational basis remains good law now that Bowers has been overruled.  See, e.g., Venn v. St. Paul Fire & Marine Ins. Co., 99 F.3d 1058, 1063 (11th Cir. 1996) (noting that the "law of the case . . . does not apply to bar reconsideration of an issue when

62

morality as a legitimate state interest that can justify criminalizing private consensual sexual conduct, the majority, although acknowledging that the district court will have to do so, never once addresses how our holding in Williams II can remain good law. Justice Scalia, in his Lawrence dissent, specifically noted that the principles we relied upon in our decision in Williams II have been "discarded" by Lawrence:

> It seems to me that the "societal reliance" on the principles confirmed in Bowers and discarded today has been overwhelming. Countless judicial decisions and legislative enactments have relied on the ancient proposition that a governing majority's belief that certain sexual behavior is "immoral and unacceptable" constitutes a rational basis for regulation. See, e.g., Williams v. Pryor, 240 F.3d 944, 949 (C.A. 11 2001) (citing Bowers in upholding Alabama's prohibition on the sale of sex toys on the ground that "[t]he crafting and safeguarding of public morality . . . indisputably is a legitimate government interest under rational basis scrutiny").

123 S. Ct. at 2490 (Scalia, J., dissenting) (emphasis added).

Whether Alabama's legislature believes that the use of sex toys may be improper or immoral, the Supreme Court has explained that "[t]hese considerations do not answer the question before us, however. The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. Our obligation is to define the liberty of all, not to

---

. . . controlling authority has since made a contrary decision of law applicable to that issue").

mandate our own moral code." Id. at 2480 (discussing traditional moral views disapproving of homosexuality) (internal quotation marks and citation omitted).

## IV. Conclusion

For all the reasons explicated above, Alabama's statute should be invalidated because it violates a substantive due process right of adults to engage in private consensual sexual activity and because the state's reliance on public morality fails to provide even a rational basis for its law. Ignoring Lawrence, the majority turns a reluctance to expand substantive due process into a stubborn unwillingness to consider relevant Supreme Court authority. I dissent.