2013 COA 155

**COLORADO MINING ASSOCIATION,**
Plaintiff–Appellant,

v.

Christopher E. URBINA, Executive Director of the Department of Public Health and Environment for the State of Colorado; Colorado Department of Public Health and Environment; Colorado Air Quality Control Commission; and Air Pollution Control Division, an agency of the State of Colorado, Defendants–Appellees,

and

EnCana Oil & Gas (USA); Chesapeake Energy Corporation; Noble Energy, Inc.; Public Service Company of Colorado; Environment Colorado; Environmental Defense Fund; Conservation Colorado; Sierra Club; and Western Resource Advocates, Intervenors–Appellees.

Court of Appeals No. 12CA1628

Colorado Court of Appeals,
Div. I.

Announced November 21, 2013

Seby Larsen, LLP, Paul M. Seby, Marian C. Larsen, Denver, Colorado, for Plaintiff-Appellant.

John W. Suthers, Attorney General, Casey Shpall, Deputy Attorney General, Thomas A. Roan, First Assistant Attorney General, Denver, Colorado, for Defendants-Appellees.

RoweLaw, LLC, Russell P. Rowe, R. William Rowe, Greenwood Village, Colorado, for Intervenors-Appellees EnCana Oil & Gas (USA), Chesapeake Energy Corporation, and Noble Energy, Inc.

Faegre Baker Daniels, LLP, Michael S. McCarthy, Linda L. Rockwood, Ann Prouty, Denver, Colorado, for Intervenor-Appellee Public Service Company of Colorado.

Gallagher Law Group, P.C., Jill H. Van Noord, Thomas H. Bloomfield, Boulder, Colorado, for Intervenors-Appellees Environment Colorado, Environmental Defense Fund, Conservation Colorado, Sierra Club, and Western Resource Advocates.

Opinion by JUDGE ROMÁN

¶ 1 Plaintiff, Colorado Mining Association (CMA),[1] a trade association representing coal producers, appeals the trial court's judgment dismissing as moot its claims against defendants, Colorado Department of Public Health and Environment (CDPHE), Christopher E. Urbina in his capacity as Executive Director of CDPHE, the Colorado Air Quality Control Commission (AQCC), and the Air Pollution Control Division (collectively the agencies). CMA alleged that the rulemaking process employed by the agencies in promulgating environmental air quality regulations violated procedural rules, resulting in harm to CMA's members. The trial court, however, concluded that subsequent legislation adopting the regulations, section 25-7-133.5, C.R.S.2013, mooted any procedural challenge to the agencies' rulemaking.

¶ 2 We agree with the trial court and therefore affirm its judgment determining this case is moot. Because an order declaring the AQCC's procedures invalid would not affect section 25-7-133.5, and the CMA has not challenged the validity of that statute, the relief sought in this appeal—invalidation of the regulations—would have no practical effect.

## I.   Legal Background

¶ 3 This case involves a unique and complex statutory and regulatory scheme under which Colorado submits proposed environmental air quality regulations to the United States Environmental Protection Agency (EPA). To facilitate our analysis, we begin by providing the background of the relevant statutes and regulations, as well as the involved agencies and entities.

## A.   Clean Air Act

¶ 4 Through section 169A of the Clean Air Act (CAA), 42 U.S.C. § 7401 (2012), the United States Congress has sought to protect visibility in certain National Parks and Wilderness Areas. *See* 42 U.S.C. §§ 7491, 7492 (2012). The CAA operates through cooperative federalism procedures that require states to develop and submit, for EPA's review and approval, a State Implementation Plan (SIP) designed to achieve the environmental protection goals set forth by Congress in the CAA. *See* 42 U.S.C. §§ 7410, 7492 (2012); *see also New York v. United States,* 505 U.S. 144, 167–68, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (defining cooperative federalism). Once a state submits a complete SIP to the EPA, the EPA determines whether to approve it. 42 U.S.C. § 7410(k)(2)-(3) (2012). If a state fails to submit an acceptable SIP, the EPA must formulate its own plan for the state, called a Federal Implementation Plan. 42 U.S.C. § 7410(c) (2012).

1.   Appendix A to this opinion provides a chart   summarizing the acronyms used herein.

## B.  Regional Haze Regulations

¶ 5 Pursuant to section 169A of the CAA, the EPA promulgated regulations aimed at decreasing visibility-impairing pollutants referred to as "regional haze." *See* Regional Haze Rule, 40 C.F.R. §§ 51.300 to 51.309 (2012).  Under the Regional Haze Rule, states are required to amend their SIPs to "establish goals ... that provide for reasonable progress towards" reducing regional haze.  40 C.F.R. § 51.308(d)(1) (2012). To achieve "reasonable progress," the rule requires states to install "Best Available Retrofit Technology" (BART) on existing facilities that emit visible pollutants.  *See* 40 C.F.R. § 51.301 (2012).  Alternatively, states may propose other means for reducing regional haze, so long as those means would "achieve greater reasonable progress than would be achieved through the installation and operation of BART."  40 C.F.R. § 51.308(e)(2) (2012).

## C.  Clean Air—Clean Jobs Act

¶ 6 In 2010, the General Assembly enacted the Clean Air—Clean Jobs Act (CACJA), in part to fulfill the requirements of the CAA and the Regional Haze Rule. *See* §§ 40–3.2-201 to –210, C.R.S.2013.  Under the CACJA, rate-regulated utility companies that own coal-fired electric generating facilities in Colorado were required to submit emission reduction plans to the Colorado Public Utilities Commission (PUC) on or before August 15, 2010. § 40–3.2-204(1), C.R.S.2013.  CACJA further required that utility companies consult with the CDPHE in developing their plans, prior to submission to the PUC. § 40–3.2-204(2)(b), C.R.S.2013.  A final emission reduction plan under CACJA must be consistent with "the current and reasonably foreseeable requirements of the [CAA]," and must "include a schedule that would result in full implementation of the plan on or before December 31, 2017." § 40–3.2-204(2)(b)(I), (2)(c), C.R.S.2013.

¶ 7 Once a utility company submits a plan to the PUC, the PUC is required to "review the plan and enter an order approving, denying, or modifying the plan" to ensure consistency with federal and state requirements. § 40–3.2-205(2), C.R.S.2013.

¶ 8 After a utility company files a plan with the PUC, the AQCC is required to schedule a hearing to determine whether the plan should be incorporated into Colorado's SIP. § 40–3.2-208(1), C.R.S.2013.  However, the AQCC cannot act on the plan until the PUC finally approves it. § 40–3.2-208(2)(a), C.R.S.2013.  All proceedings conducted by the AQCC in relation to a proposed plan require "public notice and an opportunity for the public to participate." §§ 25–7–110(1), 40–3.2-208(2)(c), C.R.S.2013.  These proceedings must comply with the rulemaking procedures in the Colorado Administrative Procedure Act (APA), section 24–4–103, C.R.S.2013.  *See* § 25–7–110(1) (requiring sixty-day notice and compliance with the rulemaking requirements of the APA for the adoption, promulgation, or modification of any air quality standard or regulation); § 25–7–133(3), C.R.S.2013 (requiring compliance with the APA when a proposed SIP amendment contains terms more stringent than federal requirements).  The AQCC's rulemaking procedures are referred to as "Phase III Rulemaking."  Once the AQCC approves the plan, it is incorporated into Colorado's SIP, subject to legislative review and EPA approval.

## D.  Legislative Review of the
## SIP Amendments

¶ 9 Section 25–7–133(1), C.R.S.2013, requires the AQCC to submit an annual summary of any additions or changes to Colorado's SIP to the General Assembly's Legislative Council.  The Legislative Council is an executive committee consisting of six senators, six representatives, and the leadership of both the Senate and House. § 2–3–301(1), C.R.S.2013.  Section 2–3–303, C.R.S.2013, defines the functions of the Council, which include

> collect[ing] information concerning the government and general welfare of the state; ... examin[ing] the effects of constitutional provisions and statutes and recommend[ing] desirable alterations; ... consider[ing] important issues of public policy and questions of statewide interest; ... [and] prepar[ing] for presentation to the members and various sessions of the

general assembly such reports, bills, or otherwise, as the welfare of the state may require.

*See also* § 2–3–311(1)(b), C.R.S.2013 (Legislative Council shall "[e]ncourage and assist state officials and employees to cooperate with officials and employees of . . . the federal government").

¶ 10 Once the annual summary is submitted, one of two scenarios can occur.

¶ 11 First, the General Assembly may choose not to act, in which case the SIP is submitted to the EPA for final approval. § 25–7–133(2)(b), C.R.S.2013.

¶ 12 Second, any member of the General Assembly may request the Legislative Council to hold a hearing to review the additions or changes to the SIP. § 25–7–133(2)(a), C.R.S.2013. The purpose of such a hearing is to "determine whether the addition or change to the SIP element accomplishes the results intended by enactment of the statutory provisions under which the addition or change to the SIP element was adopted." *Id.* At the conclusion of the hearing, the Legislative Council may recommend the introduction of a bill either to reject or to approve the proposed SIP amendments for submission to the EPA. *Id.*

### E. Public Service Company's Emission Reduction Plan

¶ 13 Before the deadline for filing emission reduction plans, the Public Service Company of Colorado (PSCo)[2] collaborated with CDPHE to develop an emission reduction plan, which was eventually submitted to the PUC and approved by the PUC and the AQCC. Accordingly, the AQCC sent a summary of the proposed SIP changes to the Legislative Council for review and approval on January 14, 2011.

¶ 14 In response to the summary of the SIP amendments, several state legislators requested the Legislative Council conduct a hearing to review the SIP amendments under section 25–7–133(1). In their request, the legislators cited "serious concerns" re-

garding whether the AQCC's and the PUC's analysis and approval of the SIP amendments were conducted in accordance with the agencies' duties under the APA. *See* §§ 24–4–101 to –108, C.R.S.2013. Specifically, the request noted that the AQCC provided the public with three weeks to review and comment on the proposed SIP amendments, when by statute it was required to provide sixty days notice. *See* § 25–7–110(1). The request also noted that the agencies, in violation of the APA, had failed to allow the public an opportunity to comment on certain substantive determinations.

¶ 15 Accordingly, on March 25, 2011, the Legislative Council held a hearing on the SIP amendments. During the hearing, representatives of the CDPHE, the AQCC, and multiple energy companies testified regarding the SIP amendments and the procedures employed by the PUC and AQCC. Members of the public also testified on their own behalves. At the conclusion of the hearing, the Legislative Council voted unanimously, seventeen to zero, to recommend that a bill be drafted to ratify the SIP amendments.

### F. HB 11–1291

¶ 16 Following the Legislative Council hearing, HB 11–1291 was introduced in the House of Representatives. The first portion of the bill included a legislative declaration, which stated that it was the intent of the General Assembly to approve the SIP amendments proposed by the AQCC on January 14, 2011. The second section of the bill amended section 25–7–133.5 by adding the following subsections:

> (2) Pursuant to section 25–7–133, the following revisions to the state implementation plan (SIP), which were adopted by the air quality control commission on the dates indicated and received by the legislative council for review, are approved for incorporation into the state implementation plan:
>
> . . .

---

**2.** PSCo is a rate-regulated utility company that operates coal-fired generating facilities in Colo-

rado.

(bb)(I) The "Colorado Visibility and Regional Haze State Implementation Plan for the Twelve Mandatory Class I Federal Areas in Colorado," adopted by the air quality control commission on January 7, 2011.

(II) The automatic expiration of the rules contained in the plan specified in subparagraph (I) of this paragraph (bb) that were adopted on January 7, 2011, and that are therefore scheduled for expiration on May 15, 2012, is postponed, effective May 15, 2011.

¶ 17 Following Senate and House approval, the bill was signed into law by Governor Hickenlooper on May 4, 2011. Ch. 144, sec. 2, § 25–7–133.5(2), 2011 Colo. Sess. Laws 502. On May 25, 2011, the Governor submitted the proposed SIP amendments in section 25–7–133.5 to the EPA for review. On September 11, 2012, the EPA announced its approval of the SIP amendments.

## II. Factual and Procedural Background

¶ 18 CMA is a trade association whose members include both individuals and organizations engaged in the exploration, production, and refining of coal. On March 16, 2011, following the AQCC's approval of the SIP amendments but prior to the Legislative Council's hearing, CMA filed its complaint for judicial review in this case. The complaint sought review of the AQCC's Phase III Rulemaking, alleging that the AQCC had failed to (1) provide sixty days notice for CMA's members to comment on the proposed SIP amendments, and instead only provided three weeks notice, in violation of section 25–7–110(1); (2) conduct rulemaking procedures with respect to certain substantive terms in the proposed SIP amendments in violation of section 24–4–102(15), C.R.S. 2013; (3) conduct necessary investigation prior to the rulemaking process in violation of section 25–7–102, C.R.S. 2013; (4) provide notice of portions of the proposed SIP amendments that contained terms more stringent than the CAA in violation of section 25–7–110.5(5)(a), C.R.S.2013; and (5) address the "sound economic conditions of the energy producing communit[y]" in violation of section 40–3.2–202(3), C.R.S.2013. The complaint further alleged that CMA's members were adversely affected by the AQCC's rulemaking, because under the amended SIP, Colorado utility companies would purchase three to four million tons less coal per year from CMA members.

¶ 19 CMA's complaint asked the trial court to invalidate the proposed SIP amendments adopted by the AQCC, vacate the Phase III Rulemaking, and renotice it to the public, based on the AQCC's failure to comply with the above-noted Colorado statutes.

¶ 20 Following the passage of HB 11–1291, the trial court requested oral argument on the issue of whether CMA's claims were moot. After oral argument, the trial court issued an order concluding that a ruling in favor of CMA would have no practical effect due to the enactment of HB 11–1291, and, thus, CMA's claims should be dismissed as moot. CMA moved the court to reconsider, relying on existing cases not previously cited, including *Sierra Club v. Indiana–Kentucky Electric Corp.*, 716 F.2d 1145 (7th Cir.1983). The trial court denied the motion to reconsider without making additional findings of fact or conclusions of law.

## III. Mootness

¶ 21 CMA, on the one hand, asserts that the trial court erred by dismissing its claims as moot, because a ruling in its favor could lead the EPA not to enforce the SIP amendments, notwithstanding the enactment of HB 11–1291. The agencies, on the other hand, assert that such an order would have no practical effect because the enactment of HB 11–1291 rendered irrelevant any procedural violations by the AQCC. We agree with the agencies.

### A. Legal Standards

■ ¶ 22 "A case is moot when the relief sought, if granted, would have no practical legal effect on the controversy." *Gresh v. Balink*, 148 P.3d 419, 421 (Colo.App.2006).

■ ¶ 23 We review de novo the legal question of whether a case is moot. *See generally Ashton Props., Ltd. v. Overton*, 107 P.3d 1014, 1017 (Colo.App.2004) (questions of law are reviewed de novo).

¶ 24 Our analysis of mootness here requires statutory interpretation. We likewise review de novo issues of statutory interpretation and legislative intent. *Smith v. Exec. Custom Homes, Inc.,* 230 P.3d 1186, 1189 (Colo.2010); *Fischbach v. Holzberlein,* 215 P.3d 407, 409 (Colo.App.2009).

¶ 25 When interpreting a statute, we strive to adopt the statutory construction that best effectuates the legislative purposes. *Smith,* 230 P.3d at 1189. To determine the legislative intent, we look to the plain language of the statute, giving the language its commonly accepted and understood meaning. *Id.* When the plain language of the statute is clear and unambiguous, we apply the statute as written. *Id.*

### B. Discussion

¶ 26 CMA sought a declaration that the AQCC violated section 25–7–110, and requested that the trial court invalidate the BART Alternative Plan adopted by the AQCC. After the plan was submitted to the Legislative Council, however, the Legislative Council held a hearing to review the plan under section 25–7–133(2)(a). The plan was ultimately approved by the General Assembly and signed by the governor. Therefore, a challenge to the AQCC's procedural violations does not affect the validity of the statute. *See Vagneur v. City of Aspen,* 2013 CO 13, ¶ 57, 295 P.3d 493 (it is not "unusual for legislative acts to trigger changes to administrative practices, or to have the effect of reversing or rendering moot prior administrative actions").

¶ 27 Additionally, section 25–7–133 contemplates three primary methods to submit a SIP to the EPA. The first method is the course of action taken in this case—a hearing by the Legislative Council followed by a vote by the General Assembly:

> [A]ny member of the general assembly may make a request in writing to the chairperson of the legislative council that the legislative council hold a hearing or hearings to review any addition or change to elements of the SIP contained in the report submitted pursuant to subsection (1) of this section. Upon receipt of such request, the chairperson of the legislative council shall forthwith schedule a hearing to conduct such review. Any review by the legislative council shall determine whether the addition or change to the SIP element accomplishes the results intended by enactment of the statutory provisions under which the addition or change to the SIP element was adopted. The legislative council, after allowing a public hearing preceded by adequate notice to the public and the commission, may recommend the introduction of a bill or bills based on the results of such review.

§ 25–7–133(2)(a).

¶ 28 Here, pursuant to this section, a hearing was requested, a bill was introduced, and the bill was ultimately enacted into law. Significantly, there has been no challenge to the validity of the statute or the procedures employed to enact it.

¶ 29 The second method involves inaction by the Legislative Council, and therefore, submittal of the AQCC's plan directly to the EPA for final approval. § 25–7–133(2)(b).

¶ 30 Under the third method, "[a]ny member of the general assembly ... introduce[s] a bill to modify or delete all or a portion of the SIP or any rule or additions or changes to SIP elements which are a component thereof." § 25–7–133(2)(c), C.R.S.2013.

¶ 31 Had the SIP in this case been submitted to the EPA through the second method, and the legislature not been involved, a finding of a procedural violation would have had a practical effect on the controversy. That was the situation in *Sierra Club,* 716 F.2d 1145, on which CMA relies. But that is not the situation in this case. Rather, here, the General Assembly approved the SIP by enacting a statute. When the legislature "enacts intervening legislation that definitively resolves the issues a litigant seeks to put before us, the claims are moot and we are precluded from deciding them." *Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency,* 373 F.3d 1251, 1309 (C.A.D.C.2004). This is because "[n]o determination as to the soundness of the administrative and executive actions leading up to" the statute's enactment, will undo its binding effects. *Id.* We therefore disagree with CMA's specula-

tion that the EPA could somehow challenge the validity of the statute based on some alleged procedural irregularity in agency proceedings.

¶ 32 Thus we conclude that where, as here, a SIP is ultimately approved by the General Assembly through enactment of a statute, a challenge to the AQCC's actions becomes moot upon passage of the statute. *See id.* (Congress' enactment of a law that approved a site for development of a nuclear repository rendered the administrative actions leading up to the law's enactment moot); *Mobil Oil Corp. v. United States EPA*, 35 F.3d 579, 585 (D.C.Cir.1994) (challenge to EPA interim final rule rendered moot by passage of subsequent statute that effectively codified preexisting EPA rule).

¶ 33 Moreover, it does not matter that courts have authority to review agency action pursuant to the APA. We are aware of no authority for the proposition that a challenge to agency action pursuant to the APA is somehow immune from being rendered moot. The power of judicial review simply does not extend to moot questions.

¶ 34 Because the General Assembly approved the SIP through the passage of section 25–7–133.5(2)(bb), and the CMA does not challenge the validity of that statute, we conclude that the case is moot.

¶ 35 Judgment affirmed.

JUDGE FOX specially concurs.

JUDGE TAUBMAN dissents.

¶ 36 Appendix A

Acronym Chart

APA—Administrative Procedure Act

AQCC—Colorado Air Quality Control Commission

BART—Best Available Retrofit Technology

CAA—Federal Clean Air Act

CACJA—Clean Air—Clean Jobs Act

CDPHE—Colorado Department of Public Health and Environment

CMA—Colorado Mining Commission

EPA—Environmental Protection Agency

PSCo—Public Service Company of Colorado

PUC—Colorado Public Utilities Commission

SIP—State Implementation Plan

JUDGE FOX specially concurring.

¶ 37 I agree that this case is moot for the reasons the majority opinion provides. I disagree with CMA's suggestion that it has been deprived of the opportunity to lodge objections to the AQCC's rulemaking. The record in this case suggests otherwise. Moreover, the regulated entities have acted in reliance on agency decisions and some of those actions may be difficult or impossible (not to mention expensive) to reverse at this late stage. Our General Assembly has spoken clearly about cleaning our air in more than one statute, including, as relevant here, in HB 11–1291 and in the CACJA. And, here the process resulting in the SIP modifications was an extensive and coordinated process involving multiple governmental entities who afforded the public, regulated business, and others—including CMA—ample opportunity to object and to be heard. CMA's invitation for courts to second-guess the highly technical and painstaking work that CDPHE, the AQCC, and the PUC have undertaken to implement the General Assembly's directives, when the legislative action implementing that work is not challenged, is misguided.

## I. The Record Supports The Trial Court's Actions

### A. Detrimental Reliance

¶ 38 Prolonging the process has caused, and will continue to cause, detrimental reliance on HB 11–1291. Even as of the January 7, 2011, hearing before the AQCC, regulated entities had acted in reliance on the SIP negotiation process and on the PUC's December 15, 2010, decision. It would come as no surprise if additional actions, relying on the PUC and the AQCC decisions, had taken place in the two and a half years since then. The record substantiates that some of those actions may be difficult and expensive to reverse now. A lawyer representing one of the public utilities at the January 7, 2011, AQCC hearing described the process as fol-

lows: "When we shut down a power plant we will tear it down. We will recover as much of the material as we can, reuse what we can.... We will remediate the site, and then we'll reuse the site for other purposes." The actions taken in reliance on the PUC's and AQCC's decisions—and the General Assembly's later implementation of those decisions by means of HB 11–1291—should not be underestimated. *See generally Tarco, Inc. v. Conifer Metro. Dist.,* 2013 COA 60, ¶ 39, 316 P.3d 82 ("Equitable estoppel is based on principles of fair dealing and is designed to prevent manifest injustice.").

## B. CMA Fully Participated in the AQCC and PUC Processes

### 1. AQCC and PUC Processes

¶ 39 The context in which the AQCC conducted the rulemaking regarding the Regional Haze SIP is significant because (1) the AQCC's actions were part of a broader coordinated process necessary to implement the CACJA, §§ 40–3.2–201 to –210, C.R.S.2013; (2) the CACJA contained hard deadlines for implementation; and (3) the CACJA included a legislative declaration that encouraging "Colorado's public utilities to reduce emissions of air pollutants and to increase energy efficiency are matters of statewide concern." § 40–3.2–101, C.R.S.2013; *see* § 40–3.2–202, C.R.S.2013.

¶ 40 The CACJA imposed various requirements on the PUC, CDPHE, and AQCC. Among those requirements was a directive to "expeditiously accelerate coal plant retirements," § 40–3.2–206(1)(a), C.R.S.2013, including by "replacing or repowering" coal generation with natural gas generation or other low emitting resources. *Id.* The CACJA aptly recognized that its directives needed to be coordinated with the Regional Haze elements of the state's SIP. § 40–3.2–208(2)(a), C.R.S.2013; *see also* § 40–3.2–205(2)(b)(I), C.R.S.2013.

¶ 41 Consistent with the CACJA and after coordinating with the AQCC (which in turn consulted with CDPHE),[1] PSCo filed its plan to reduce emissions on August 13, 2010. *See* § 40–3.2–204(1), C.R.S.2013 (requiring emis-

sions reduction plan no later than August 15, 2010). On September 2, 2010, in accordance with section 40–3.2–208(2)(a) of the CACJA and as relevant to CMA's challenge, the AQCC provided its Notice of Proposed Rulemaking, followed by its September 21, 2010, Notice of Public Rulemaking Hearing. Both notices concerned the Regional Haze element of Colorado's SIP (including PSCo's emissions reductions plan). The September 21, 2010, Notice states, in relevant part:

> The Commission will also consider a complete replacement of the previously adopted State Implementation Plan (SIP) for Regional Haze, largely in response to comments provided by and discussions with U.S. EPA. Substantive changes to the Regional Haze SIP include, but are not limited to, a description of the PSCo of Colorado's BART alternative in Chapter 6 of the SIP pursuant to [the Clean Air— Clean Jobs Act]. The Commission *will consider any alternative proposals submitted* to address the issues in this notice.... Such *proposals may include, but [are] not ... limited to, alternatives to ... the PSCo of Colorado's BART alternative submitted* to the Commission consistent with [the Clean Air—Clean Jobs Act,] including any emissions reduction plans approved by the Colorado Public Utilities Commission[;] ... any other regional haze alternatives proposals for Reasonable Progress Sources; and any outstanding BART determinations that the Commission has not previously made.

(Emphasis added.)

¶ 42 The public and regulated entities alike were on notice that the Regional Haze components of Colorado's SIP were in transition. They also knew how (and by when) to lodge their objections.

### 2. CMA's Participation in the AQCC and PUC Processes

¶ 43 Even if the CACJA had not notified the regulated community, including CMA, about its effect (or potential effect) on the state's SIP process (and I believe it did), the AQCC's notice unquestionably fairly apprised

---

1. *See* §§ 40–3.2–204(2)(b), 40–3.2–205(1)–(2), C.R.S.2013.

interested parties of the PUC's concurrent and pivotal role in the proceedings to implement the CACJA's statutory directives. CMA understood the PUC's role. As the record shows, not only did CMA have party status before the PUC, but it actively participated in the PUC proceeding.

¶ 44 The PUC and the AQCC each accepted written submissions in advance of their respective hearings. CMA submitted written comments to both entities. The PUC held evidentiary hearings in 2010, specifically on October 21, 22, 25, 26, 28, 29, and 30, and November 1, 2, 3, 18, 19, and 20. The PUC allowed all interested or affected parties to be heard, to examine and cross-examine witnesses, and to introduce evidence. After reviewing written submittals, the AQCC also conducted a hearing and gave interested parties an opportunity to voice their objections.

¶ 45 The PUC concluded that it had "satisfied and exceeded minimum standards of statutory due process" by allowing all intervenors to be "heard, examine and cross-examine witnesses, and introduce evidence." [2] The PUC directly addressed the argument CMA continues to advance, that PSCo's August 13, 2010, filing (its plan to reduce emissions) contained a single plan for which approval was sought. According to CMA, supplemental materials filed on October 25, 2010, contained "new plans" and therefore were untimely (CMA seems to argue that each time a new plan was evaluated, a new notice and comment period was triggered). The PUC, responding to this argument, pointed out that the August 13, 2010, emissions reduction plan contained numerous

scenarios for consideration, all of which remained viable even after PSCo's preferred plan was rejected. *See Regular Route Common Carrier's Conference v. Pub. Utils. Comm'n,* 761 P.2d 737, 748 (Colo.1988) (where a state APA provision parallels the federal APA, it is appropriate to consider federal precedent and other commentary); *see also* S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945) (notice must only be "sufficient to fairly apprise interested parties of the issues involved"); *American Med. Ass'n v. United States,* 887 F.2d 760, 768 (7th Cir.1989) (examining the federal APA and its history to conclude that "notice need not identify every precise proposal which the agency may ultimately adopt" as long as it adequately apprises interested parties of the issues to allow them to participate).[3]

¶ 46 The AQCC's notice also contemplated an evolving process and an opportunity for others to suggest emission reduction alternatives.

¶ 47 During the January 7, 2011, hearing, members of the AQCC asked thoughtful and probing questions of CMA's and Peabody Energy's respective counsel.[4] CMA's written submissions, oral presentations, and examination are well documented in the 7524–page record of AQCC's administrative proceedings. Nothing in that record substantiates that CMA's procedural (and other) concerns were not heard or were not considered. After its hearing, the AQCC addressed CMA's objections to the notice provision, recognizing its concerns, but also highlighted the duties under the CACJA. While the AQCC was open and receptive to comments,

---

**2.** CMA intervened and sought party status in the PUC case. In addressing the procedural complaints lodged by CMA (and others), the PUC also concluded that because those parties had not "articulated a liberty or property interest at stake," or the "applicability of procedural due process standards," they were entitled to only statutory due process and that such process was afforded. In addition to the PUC's well-reasoned and thorough forty-four-page decision issued on January 26, 2011, the PUC references two earlier opinions addressing these same issues: Decision C10–125 and Decision C10–1328.

**3.** This makes absolute sense. That an agency changes (or modifies) its approach to the issue does "not signify the failure of the administrative process" but rather it shows that the agency treats the notice-and-comment process seriously and is willing to modify its position as more information becomes available. *See Am. Med. Ass'n,* 887 F.2d at 767. Requiring a new notice and comment every time a promulgated rule differs from the proposed rule would lead to "absurdity" in that the agency could "learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *Id.* at 768; *accord Int'l Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 & n. 51 (D.C.Cir. 1973).

**4.** Peabody Energy advanced many of the same arguments as CMA.

it was cognizant of the CACJA deadlines. That the AQCC did not grant CMA (or Peabody) the additional delays it requested does not invalidate the AQCC's actions.

¶ 48 After the AQCC adopted an emissions reduction plan as part of Colorado's Regional Haze SIP on January 7, 2011 (which includes the now challenged rulemaking), the AQCC submitted a report to the Legislative Council on January 11, 2011, as required by section 25–7–133(1), C.R.S.2013. Additional opportunity for public input was available as part of the Legislative Council's review, which resulted in recommendations to the General Assembly to approve the updates to Colorado's SIP. *See* § 25–7–133(2)(a), C.R.S.2013.

### C. Opportunity to Comment Concerning HB 11–1291

¶ 49 The summary of the March 25, 2011, hearing, held pursuant to section 25–7–133(2)(a), states that the hearing was called to determine whether the AQCC acted "properly and in accordance with state and federal laws in incorporating the PSCo Emission Reduction Plan into the SIP." In addition to testimony from various individuals,[5] legislators received documents relevant to the issue. With two exceptions, all the speakers favored adoption of the SIP. The testimony and the materials provided to the Legislative Council—which materials would have been available to the public and the General Assembly—were designed to address the AQCC's compliance with state and federal law.

¶ 50 Senator Cadman and Speaker McNulty inquired about notice to the public. The legislators were educated about the AQCC's process and received reassurance that state laws, including procedural laws, were followed. William Allison, on behalf of the Colorado Department of Law and acting as counsel for CDPHE, specifically represented that the AQCC followed its normal procedures for public notice and public input. The administrative record of the AQCC proceedings substantiates that statement.

¶ 51 At the conclusion of the hearing, Speaker McNulty moved that the Legislative Council recommend a bill to ratify the changes and additions to the SIP, thereby postponing the automatic expiration of the rules contained in the then-existing SIP. The motion passed[6] and HB 11–1291 was later introduced in the House of Representatives. HB 11–1291 was approved by the House and the Senate and signed into law on May 4, 2011. Thus, another hearing addressing CMA's concerns in the district court would effectively repeat the hearing already held by the General Assembly. It is not the judiciary's role to second-guess the legislature, especially here, where doing so would not be in the interest of judicial economy and CMA had extensive opportunity to raise its concerns throughout the legislative process. *See People v. Summit*, 183 Colo. 421, 428–29, 517 P.2d 850, 854 (1974).

### II. Conclusion

¶ 52 I concur in the majority's finding of mootness, especially where the record substantiates that (1) the regulated parties have acted in reliance on the PUC's and the AQCC's decisions; (2) the AQCC and PUC processes afforded CMA ample opportunity to be heard; (3) the General Assembly has spoken clearly and unequivocally and courts need to be cautious not to impinge on the policy choices of that co-equal branch of government; and (4) courts need to be careful in second-guessing subject-matter experts. Accordingly, I join in affirming the trial court's decision.

---

5. Speakers included representatives from the Office of Legislative Legal Services, from the AQCC, from CDPHE, from the Colorado Department of Law, from the Regional Air Quality Control Council, from industry, and from the public. CMA's counsel from the PUC proceeding appeared and voiced her concerns. Although our record contains the summary, it does not appear to contain all the materials provided to the legislators. The legislative history of HB 11–1291, including the tapes of the March 25, 2011, hearing, are available to us. *See* Hearings on H.B. 1291 before the Joint Comm. on Legislative Council, 68th Gen. Assemb., 1st Sess. (Mar. 25, 2011).

6. The motion passed with seventeen affirmative votes (one legislator was excused from the proceedings).

JUDGE TAUBMAN dissenting.

¶ 53 Everyone agrees that courts should not address issues when their decisions will have no practical legal effect. The majority concludes that the enactment of a statute by the General Assembly approving proposed air quality regulations, for final approval by the Environmental Protection Agency, moots the challenge to the rulemaking procedure employed in adopting those regulations.

¶ 54 I respectfully disagree. In my view, the General Assembly approved only the substance of the proposed regulations, but Colorado's Administrative Procedure Act (APA) gives plaintiff, the Colorado Mining Association (CMA), a statutory right to litigate its claims that the APA's rulemaking procedures were not properly followed. Procedural fairness demands no less.

¶ 55 I would hold that the actions of the Legislative Council and subsequently the General Assembly did not moot the case because a ruling in favor of CMA could lead the Environmental Protection Agency (EPA) to disapprove of the State Implementation Plan (SIP) amendments, notwithstanding the legislature's enactment of HB 11–1291.

¶ 56 As the majority notes, CMA mounts five challenges to the APA rulemaking procedures: the Colorado Air Quality Control Commission (AQCC) failed to (1) provide sixty days notice for CMA's members to comment on the proposed SIP amendments, and instead only provided three weeks notice, in violation of section 25–7–110(1), C.R.S.2013; (2) define "reasonably foreseeable requirements" of the federal Clean Air Act (CAA) in violation of section 24–4–102(15), C.R.S.2013; (3) provide notice of portions of the proposed SIP amendments that contained terms more stringent than the CAA in violation of section 25–7–110.5(5)(a), C.R.S.2013; (4) conduct necessary investigation before initiating the rulemaking process in violation of section 25–7–102, C.R.S.2013; and (5) address the "sound economic conditions of the energy producing communit[y]" in violation of section 40–3.2–202(3), C.R.S.2013. CMA also contended that AQCC's rulemaking process

would adversely affect its members because the amended SIP would require Colorado utility companies to purchase three to four million tons less coal per year from CMA members. Because of these alleged violations and injuries, CMA requested the trial court to invalidate the proposed SIP amendments adopted by the AQCC, vacate the Phase III Rulemaking, and renotice it to the public.

¶ 57 However, the trial court found that the General Assembly's passage of HB 11–1291 mooted CMA's challenges and did not decide the case on the merits. On appeal, CMA asserts that the legislature's approval of HB 11–1291 did not moot the case; rather, a trial court's invalidation of the AQCC's procedures would preclude the legislature from enforcing the SIP under *Sierra Club v. Indiana–Kentucky Elec. Corp.*, 716 F.2d 1145, 1152–53 (7th Cir.1983). In contrast, defendants (collectively the agencies)[1] argue that such an order would have no practical effect because the enactment of HB 11–1291 superseded any procedural violations by the AQCC. I agree with CMA, and accordingly, I would conclude that the case is not moot, reverse the trial court's judgment of dismissal, and remand the case to the trial court for consideration of CMA's claims on the merits.

## I. Applicable Law

¶ 58 Whenever possible, a court should resolve a case on its merits. *Stell v. Boulder Cnty. Dep't of Soc. Servs.*, 92 P.3d 910, 914 (Colo.2004). However, "[a] case is moot when the relief sought, if granted, would have no practical legal effect on the controversy." *Gresh v. Balink*, 148 P.3d 419, 421 (Colo.App. 2006).

¶ 59 *Sierra Club* demonstrates that a state court's invalidation of an EPA-approved SIP on state procedural grounds would have a practical legal effect on the enforceability of that SIP. 716 F.2d at 1152–53. There, Indiana submitted a SIP to the EPA, which the EPA subsequently approved. *Id.* at 1147. Approximately three years later, an

---

1. Defendants are the Colorado Department of Public Health and Environment (CDPHE); Christopher E. Urbina in his capacity as Executive Director of CDPHE; the Colorado Air Quality Control Commission (AQCC); and the Air Pollution Control Division.

Indiana state trial court held certain provisions of the SIP invalid on procedural grounds. *Id.* Four years later, the Indiana Court of Appeals affirmed the trial court, holding that the agency that approved the SIP had failed to submit written findings, and therefore had violated the state's administrative procedure act, rendering portions of the SIP invalid. *Id.*; *see Ind. Envtl. Mgmt. Bd. v. Indiana–Kentucky Elec. Corp.*, 181 Ind.App. 570, 393 N.E.2d 213 (1979). However, "[d]espite the state court ruling, the Sierra Club brought suits [in federal court to enforce the relevant portions of the SIP] against alleged polluters." *Sierra Club*, 716 F.2d at 1147.

¶ 60 Although the *Sierra Club* court did not expressly address mootness, it effectively did so, holding that the EPA could not enforce a SIP that was adopted in violation of a state's administrative procedure act. *Id.* at 1148. The court reasoned that, "[b]ecause administrative actions taken without substantial compliance with applicable procedures are invalid," where a state presents the EPA with a proposed SIP that was developed with procedural irregularities, it is as if that SIP was never proposed. *Id.* The court also noted that federal precedent encouraged, if not mandated, that challenges to SIPs be brought in state courts. *Id.* at 1151. Accordingly, the court reasoned that if the EPA could continue to enforce a SIP that was invalidated by a state court, the state court review would be "rendered utterly meaningless." *Id.* at 1149; *see also N.M. Envtl. Improvement Div. v. Thomas*, 789 F.2d 825, 833 (10th Cir.1986) ("When [an] approved SIP contains an element that is invalidated by virtue of state law, adoption by the EPA is also invalidated. The status is as if the state had not submitted a SIP.").

## II. Analysis

¶ 61 I disagree with the majority's conclusion that when a SIP is ultimately approved by the General Assembly, a challenge to the AQCC's actions becomes moot upon passage of the statute. The majority relies on *Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1309 (C.A.D.C.2004), and *Mobil Oil Corp. v. United States EPA*, 35 F.3d 579, 582–83 (D.C.Cir.1994), both of which are distinguishable.

¶ 62 In *Nuclear Energy Inst., Inc.*, 373 F.3d at 1309, Congress' enactment of the Resolution to develop a repository in Yucca Mountain mooted plaintiff's contentions. There, the state of Nevada challenged the Department of Energy's (DOE's) site-suitability criteria, the Energy Secretary's and President's recommendation to develop the repository, and the final environmental impact statement (FEIS) used to support the Secretary's and the President's recommendations regarding the Yucca site. *Id.* However, the court held that Congress' approval of the Yucca site resolved the state's challenges because those challenges were directly related to the issue of whether the Yucca site was properly selected for development as a repository. *Id.* The court found that Congress unambiguously overruled the state's notice of disapproval of the Yucca site for the development of a repository and allowed DOE to seek authorization from the Nuclear Regulatory Commission (NRC) to construct and operate a repository at the site. *Id.* at 1309–10. The court also noted that the Congressional floor debate on the Resolution confirmed "that the members of Congress intended the Resolution to approve the Yucca site, conclude the site-selection process, and permit DOE to proceed to seek a license for the repository." *Id.* at 1310. Therefore, Congress' approval of the Resolution mooted the state's contentions. *Id.*

¶ 63 In *Mobil Oil Corp*, the petitioners' challenge was also moot because Congress provided that an interim final EPA rule "shall not be terminated or withdrawn until revisions are promulgated and become effective." *Id.* at 581. Specifically, the court held that Congress "expressed a firm intent" to preclude review of the rules challenged by Mobil. *Id.* at 583. Thus, the D.C. Circuit held that the case was moot.

¶ 64 Here, however, the General Assembly never addressed CMA's challenges. In fact, neither the General Assembly nor the Legislative Council intended either implicitly or explicitly to validate the AQCC's rulemaking procedures by approving the SIP amendments. In the absence of such intent, the

General Assembly's enactment of HB 11–1291 did not moot CMA's contentions.

¶ 65 Therefore, in my view, *Sierra Club* is persuasive with respect to CMA's challenges under the APA, even though the General Assembly approved the SIP. In reaching this conclusion, I recognize that legislative approval of the SIP amendments presents a factual scenario different from that presented in *Sierra Club*. However, this distinction is not material because, as discussed below, the legislative approval of the SIP amendments did not validate the AQCC's rulemaking procedures or otherwise preclude their judicial review. Accordingly, should the trial court declare the AQCC's rulemaking procedures invalid, the EPA could choose not to enforce the proposed SIP amendments, notwithstanding the enactment of HB 11–1291.

¶ 66 The Legislative Council heard testimony regarding alleged procedural violations by the AQCC, but it did not decide whether the AQCC complied with the APA. Section 25–7–133(2)(a) required the Council to determine only whether the proposed SIP amendments accomplished the results intended by the Regional Haze Rule and the CAA. Further, while the Council has the statutory authority to "examine the effects of . . . statutes and recommend desirable alterations," determining whether an agency complied with the APA is not one of its enumerated powers. *See* § 2–3–303(1)(b), C.R.S.2013. Accordingly, because the Council was not empowered to determine whether the AQCC's rulemaking procedures were proper, I conclude that its approval of the SIP amendments did not constitute either express or implied approval of the AQCC's procedures.

¶ 67 Further, even if the Legislative Council implicitly approved the rulemaking procedures, such an approval could not preclude CMA's statutory right to judicial review under the APA. Unlike in *Mobil Oil*, where Congress explicitly precluded judicial review, here, neither the language of HB 11–1291 nor the Legislative Council's and General Assembly's actions reflect an intent to limit

judicial review of the AQCC's rulemaking procedures. Rather, they reflect only the Legislative Council's conclusion that the SIP amendments accomplished the results intended by the CAA and the Regional Haze Rule.

¶ 68 This conclusion is consistent with the APA, which provides that final agency action "shall be subject to judicial review as provided in this section." § 24–4–106(2), C.R.S. 2013.[2] The use of the word "shall" indicates the General Assembly intended the provision to be mandatory. *Associated Gov'ts v. Colo. Pub. Utils. Comm'n*, 2012 CO 28, ¶ 15, 275 P.3d 646 ("[u]nless context dictates otherwise, 'shall' denotes a mandate"); *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) (a strong presumption favors judicial review of agency actions); *Home Builders Ass'n v. Pub. Utils. Comm'n*, 720 P.2d 552, 562 (Colo.1986) (finding an agency rulemaking action void for failure to comply with proper procedures). In other words, the General Assembly expressly stated that all "final agency action" shall be subject to judicial review. § 24–4–106(2); *see also* § 24–4–103, C.R.S.2013 (requiring agencies to keep a record of rulemaking procedures to facilitate judicial review).

¶ 69 In contrast, section 25–7–133, C.R.S. 2013, does not authorize the General Assembly to supplant the APA's judicial review procedures with respect to SIP amendment rulemaking. Thus, to hold that the Legislative Council's and General Assembly's actions moot judicial review of an agency's rulemaking procedures would thwart the express purpose of section 24–4–106 without an expression of intent by the legislature supporting such a conclusion. *See* § 2–4–201(1)(b), C.R.S.2013 (in enacting a statute, it is presumed the entire statute is intended to be effective). Accordingly, I conclude that the legislature intended the APA to apply to SIP amendment rulemaking, and thus, the enactment of HB 11–1291 does not reflect legislative approval of the AQCC's rulemaking procedures.

¶ 70 The lack of contrary authority further bolsters my position that the case is not

---

2. Under section 24–4–106(1), C.R.S.2013, the General Assembly created judicial review of agency rulemaking procedures by assuring "a plain, simple, and prompt judicial remedy to persons or parties adversely affected or aggrieved by agency actions."

moot. The agencies do not cite to authority that (1) required the Legislative Council to examine whether the procedures employed by the AQCC in approving the SIP amendments complied with the APA or (2) granted the Legislative Council the power to review whether an agency properly complied with the APA, nor am I aware of any. Nor do the agencies cite to any law, legislative history, or portion of the record that demonstrates that the General Assembly intended that enactment of HB 11–1291 would preclude judicial review of alleged procedural violations in the AQCC's rulemaking procedures under the APA.

¶ 71 Finally, I recognize that the Legislative Council took testimony regarding the alleged procedural violations in the SIP rulemaking procedures, and that the Council may have considered these alleged violations in making its recommendation to the General Assembly. Even so, such consideration may not overcome CMA's right to judicial review of its APA challenges.

¶ 72 CMA contends that the agency did not provide enough time for comments and rulemaking, and therefore, in its view, the trial court should invalidate the amended SIP. I agree.

¶ 73 Because the General Assembly did not intend to preclude judicial review of the AQCC's rulemaking procedures, I conclude that a trial court's decision to invalidate the AQCC's rulemaking procedures could have at least two practical legal effects. *See Gresh,* 148 P.3d at 421. First, the trial court may remedy the AQCC's violation by requiring it to renotice the rule and allow for additional public comments. Such a remedy may be appropriate as demonstrated by federal cases interpreting the federal Administrative Procedure Act. *See Wagner Electric Corp. v.*

*Volpe,* 466 F.2d 1013, 1021 (3d Cir.1972); *Mobil Oil Corp.,* 35 F.3d at 584–85. Second, under *Sierra Club,* the EPA could cease enforcement of the amended SIP in response to the state court ruling. *See Sierra Club,* 716 F.2d at 1148; *Thomas,* 789 F.2d at 833. The EPA could take such action notwithstanding the enactment of HB 11–1291. As in *Sierra Club,* if the district court here were to determine that the APA was not properly followed, it would be as if the SIP had never been proposed, thereby rendering the General Assembly's approval of the SIP without significance. In the alternative, armed with a decision declaring the amended SIP invalid under the APA, CMA could bring an action in federal court to prevent EPA enforcement of the amended SIP, notwithstanding the enactment of HB 11–1291.

¶ 74 Accordingly, because a decision invalidating the AQCC's procedures could have a practical legal effect, I conclude that CMA's claims are not moot. In reaching this conclusion, I do not consider whether this case would have been moot had the General Assembly explicitly approved of the AQCC's rulemaking procedures. Nor am I unmindful that the Legislative Council approved the SIP unanimously and recommended its enactment to the General Assembly.[3] I simply conclude the case is not moot because a decision invalidating the AQCC's procedure could have a practical effect.[4]

¶ 75 Therefore, I would conclude that the trial court erred by dismissing CMA's claims as moot and reverse the trial court's judgment of dismissal, as well as remand the case to the trial court for consideration of CMA's claims on the merits.

---

**3.** I recognize the point made in the special concurring opinion that numerous agencies have spent a great deal of time and effort in considering the proposed regulations and obtaining the legislature's approval of the SIP. Nevertheless, these efforts do not moot CMA's procedural challenges to the SIP.

**4.** In so concluding, I offer no opinion regarding the merits of CMA's claims, other than to conclude that the claims are not moot. Accordingly, in my view, the SIP amendments would continue to be presumed valid, unless found otherwise by

the district court on remand. Further, I note that even if the trial court were to conclude that the SIP amendments are invalid for lack of notice, the proper remedy would be to require the AQCC to renotice the rule and allow for additional public comment. Following a new comment period, the AQCC would have discretion to promulgate the same SIP amendments as it did in January 2011. Thus, any concern that invalidation of the AQCC's procedure would unduly burden regulated entities is premature.